**O'BRIEN & GERE ENGINEERS, INC.**

v.

**Khalil TALEGHANI, et al.**

**Civ. A. No. 79–4309.**

United States District Court,
E. D. Pennsylvania.

Oct. 29, 1981.

---

**3.** Mrs. Smith's is incorrectly identified in the complaint under its former name, Mrs. Smith's

Pie Company, Inc.

Richard R. Rulon, Philadelphia, Pa., for plaintiff.

Herbert G. Schick, Philadelphia, Pa., for defendants.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW, AND ORDER

HUYETT, District Judge.

Following a non-jury trial, I make these findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

1. O'Brien & Gere Engineers, Inc. (O&G Inc.) is a business corporation duly organized under the laws of the State of New York. O&G Inc. is headquartered in Syracuse, New York, and has offices in five other cities throughout the eastern United States, including Philadelphia. The corporation provides engineering services to clients throughout the world. (Uncontested Fact ¶ 1)

2. Khalil Taleghani (Taleghani) is a citizen of Iran who is currently residing in the United States at 72 Curtis Drive, Teton Village, Wyoming. (Uncontested Fact ¶ 2)

3. Jamshed Daftary (Daftary) is a citizen of Iran who is currently residing in Switzerland. Service was made on Daftary by having a specially appointed process server, Ervin D. Sacks, serve a copy of the complaint and summons on Joel B. Justin in his capacity as manager and the person for the time being in charge of T–D's Philadelphia office. (Affidavit of Plaintiff's Attorney Richard R. Rulon in Support of Request for Entry of Default Against Defendant Jamshed Daftary)

4. On February 19, 1980, O&G Inc. filed a request for entry of default and supporting affidavit with the clerk of the district court requesting that a default be entered against Daftary for failure to plead, answer or otherwise defend as required by law. Daftary has not responded, either in person or through counsel, to the complaint and summons or to the request. A default was entered against Daftary by the clerk on February 19, 1980. (Request to Clerk for Entry of Default; Entry of Default)

5. In late 1972, O&G Inc. acquired control of Justin & Courtney (J–C), a Philadelphia-based engineering firm which specialized in designing water resource projects such as dams and hydroelectric power plants. Prior to its acquisition by O&G Inc., J–C had carried on its business as a partnership. Simultaneous with its acquisition, J–C was incorporated under the name Justin & Courtney, Inc. (J–C Inc.) and operated for a time as a subsidiary of O&G Inc. with J–C's former senior partner, Joel B. Justin (Justin), serving as its President and as a member of its Board of Directors. As a consequence of a stock for stock organization in January, 1978, the business of J–C Inc. was transferred to an operating division of O&G Inc. (Uncontested Fact ¶ 3)

6. During the period of time that it operated as a subsidiary of O&G Inc., J–C Inc., principally through Justin, engaged in a number of projects in Iran with an Iranian engineering firm that did business under the English name "Taleghani-Daftary, Consulting Engineers" (T–D). (Uncontested Fact ¶ 4)

7. T–D was formed by Taleghani and Daftary in 1960 and was headquartered in Tehran, Iran. Taleghani and Daftary were the two principals, each owning a 50% interest, for most of the time that the entity has been in existence. Approximately three years ago, two additional principals obtained interests in the entity. As a result of the addition of the two new parties, Taleghani's share in the entity dropped to 20%. Taleghani never told anyone at O&G Inc.

about this change in the ownership of T–D. (Testimony of Taleghani)

8. Because of the ongoing business relationship between J–C Inc. and T–D and between Justin and Taleghani, Justin had considerable opportunity to observe the operations of T–D and the role played by Taleghani and Daftary in those operations. In December 1976, while on a business trip to Iran to provide consulting services to T–D pursuant to a contract between O&G Inc.'s subsidiary, J–C Inc., and T–D, Justin reported back to O&G Inc.'s Vice President: "T–D is doing well. The two principal partners [whom Justin identified as Taleghani and Daftary] are taking over a million a year from the firm." (Uncontested Fact ¶ 5)

9. At the time he wrote the December 22, 1978 memorandum referred to in finding of fact ¶ 8, Justin was still an employee of O&G Inc. (Testimony of Justin)

10. To any third party observing it, T–D appeared to be a partnership. The name which appeared on the firm's English letterhead and under which it did business in the United States—"TALEGHANI–DAFTARY"—was comprised solely of the names of the two defendants—Taleghani and Daftary. Nothing in the English version of the firm's name suggested that it was anything other than a partnership. No words such as "Corporation", "Incorporated", "Ltd." or "Establishment" appeared in the firm's English name although the Farsi (Iranian) term for "Establishment" did appear in the Farsi version of T–D's letterhead. Moreover, T–D appeared to operate as a partnership would: i. e., it appeared that the two principals, Taleghani and Daftary, made all the major decisions and either could bind the firm. (Testimony of Taleghani, Justin and Johnson; Joint Exhibit 2)

11. In the summer of 1977, representatives of O&G Inc., including its then President, Samuel W. Williams, Jr. (Williams), participated in discussions with Justin, Taleghani and others concerning the best way to structure a continuing relationship between O&G Inc. and T–D in order to minimize the impact of both Iranian and United States taxes. In the course of these discussions, Taleghani advised those present that he would have to consult with his partner, Daftary, before any final decision could be made. At the conclusion of such discussions, Taleghani returned to Tehran to consult Daftary. In early October, 1977, O&G Inc. received a letter from Taleghani dated September 25, 1977 in which he confirmed the tentative decisions reached in the earlier discussions. In his September 25, 1977 letter, Taleghani stated:

> after discussing the matter here (in Iran) with my partner Mr. Daftary, and our tax people we think it would be to our mutual advantage, especially from a tax point of view, for Taleghani-Daftary to set up a branch office in Philadelphia to be headed and managed by Mr. J. B. Justin. This office will contract with J&C in USA for engineering consulting services to be performed in USA by J&C. All disbursements will be made directly through T–D branch office in Phila.

(Uncontested Fact ¶ 6; Joint Exhibit 2)

12. In early 1978, representatives of O&G Inc., including the President of its J–C Division, Peter C. Johnson (Johnson), engaged in negotiations with Justin, who had recently retired from O&G Inc. and was now acting as an agent and representative of T–D. The purpose of these negotiations was to formulate the terms and conditions under which O&G Inc. would provide consulting services to T–D in connection with the Doroodzan, Dariush Kabir and Taleghan water resource projects then underway in Iran. The upshot of those negotiations was an Agreement dated February 21, 1978 (February 21 Agreement) between O&G Inc. and T–D which Justin signed on behalf of T–D. (Uncontested Fact ¶ 7; Joint Exhibit 3)

13. The February 21 Agreement was prepared by Justin, acting on behalf of and as a representative of T–D and was presented by Justin to Johnson for O&G Inc.'s approval. It was written in English which was to be the ruling language. (Testimony of Justin; Joint Exhibit 3)

14. The February 21 Agreement identified O&G Inc. by its official name "O'BRIEN & GERE ENGINEERS, INC". The abbreviation "Inc." signified that O&G Inc. was a corporation. However, in the case of T–D, no such words or abbreviations appeared. The names of the two defendants alone comprised the entire firm name —"TALEGHANI–DAFTARY." (Joint Exhibit 3)

15. Other language in the February 21 Agreement shows that Justin who drafted the agreement believed that T–D was a partnership. For instance, Justin made the decision to include paragraph 2.2.6 which provides "the Agreement shall not be dissolved by the death or demise of the Client (T–D). His rights and obligations shall pass to his successors." Justin knew that such language is appropriate only in the case where the "Client" is a partnership or proprietorship. (Testimony of Justin; Joint Exhibit 3)

16. The initial contractual relationship between T–D and O&G Inc. is contained in the February 21 Agreement. The agreement reveals that T–D had certain engineering consulting contracts with agencies of the Iranian government and was engaging O&G Inc. as a consultant to T–D to supplement T–D's services to the Iranian government for the development of hydroelectric projects. The February 21 Agreement does not condition the payment by T–D of O&G Inc.'s invoices upon T–D's receipt of payments from the Iranian agencies for whom the work was performed. On the contrary, section 2.8 of the February 21 Agreement, entitled "Payments to the Consulting Engineer," provides that O&G Inc. is to be paid within one month after submission of its invoices. Section 2.8.3 provides that if T–D should question or dispute an item or part of an item in an invoice, the remainder of that invoice is to be paid within the one month period. (Joint Exhibit 3)

17. O&G Inc. personnel rendered consulting services to T–D throughout 1978. In early December, 1978, Justin wrote O&G Inc.'s Williams describing the growing civil unrest in Iran and its impact on the work O&G Inc. was performing for T–D. In this connection, Justin stated:

From the practical viewpoint T–D has contracts with the Government and they must continue until they receive orders to do otherwise. T–D is not getting paid, no one is, at present. We have sufficient funds at present for a couple of months. The situation must be reassessed at least weekly. At present foreign exchange is difficult. However, I do not believe at present there is any problem on getting paid for work completed.

(Uncontested Fact ¶ 9, Joint Exhibit 4)

18. On December 29, 1978, Justin wrote to O&G Inc.'s Johnson, reporting on the further deterioration of conditions in Iran. He reported, among other things, that ". . . business in Iran is at a standstill, banks are not functioning and no foreign exchange is being transferred." Due to such chaotic conditions, Justin directed:

The work of investigation and design of the Taleghan project should be put in the deep freeze. Your staff should prepare a memorandum of the present status of the work with reference to drawings and documents now in hand. All work should be stopped after this is completed until further notice. It will probably be several months before we can completely evaluate the future.

The Dariush Kabir report for Phase II is about 90% completed and the technical specifications for the Civil Contract is 85% completed. It is suggested that these be completed as soon as possible and we will send these to Tehran which will complete the Phase II of this project.

Future events and conditions will determine if and when the work can be reinstated.

(Uncontested Fact ¶ 10; Joint Exhibit 5)

19. The same day, Justin forwarded to Messrs. Taleghani and Daftary copies of his December 29, 1978 letter to Johnson stating in his transmittal letter:

enclosed is a letter to O'Brien & Gere suspending work on Taleghan and also Dariush Kabir after Phase II is complet-

ed. There is a summary of accounts payable, commitments and cost of liquidation of office in Philadelphia if required assuming the operations of O'Brien & Gere are suspended as indicated above and we could suspend operations here in Philadelphia February 1st. This includes the rent through 1980.

I have not included any compensation for myself in this estimate as we could work this out on personal contact. (Uncontested Facts ¶ 11; Joint Exhibit 6)

20. Following receipt of Justin's December 29, 1978 letter reporting on the chaotic conditions in Iran, Johnson of O&G Inc. sought assurances from Justin that there were sufficient funds available to pay O&G Inc. for its ongoing work. Justin advised Johnson that T–D had between $80,000 and $90,000 currently available in the United States and the government of Iran was expected to make a payment of approximately $80,000. (Testimony of Justin)

21. On January 2, 1979, Johnson wrote to Justin and requested an upward adjustment in the rates being paid O&G Inc. by T–D for the work still in progress. Justin, in a letter dated January 12, 1979, suggested to Johnson that the remaining Phase II work should be completed at the 1978 billing rates. He confirmed that, aside from finishing the Phase II work, O&G Inc.'s work for T–D was suspended due to political problems. (Uncontested Fact ¶ 12; Joint Exhibits 7 and 8)

22. In late February, 1979, as O&G Inc. was approaching the completion of its work for T–D, Johnson became increasingly concerned that O&G Inc. might not get paid for its work. Despite Justin's earlier representation that funds would be available to pay O&G Inc., no payments had been received by O&G Inc. in January or February, 1979. (Testimony of Johnson)

23. By March 6, 1979, O&G Inc. had finished the work it had been asked to complete and pursuant to Justin's instructions was performing no further work on T–D projects. As of that date, O&G Inc. was owed a total of $157,755.19 for work it had performed. (Uncontested Fact ¶ 13)

24. Johnson discussed with O&G Inc.'s President, Williams, his concern about turning over O&G Inc.'s work product to T–D before being paid. Based upon instructions from Williams, Johnson informed Justin and Taleghani that O&G Inc. would not deliver its work product to T–D until an agreement had been reached in writing, signed by both Taleghani and Daftary, which fixed the amount due O&G Inc., confirmed that such sum would be paid, and provided for interest on any unpaid amounts. (Uncontested Fact ¶ 14)

25. As a result of negotiations primarily between Johnson and Justin, but in which, at times, Taleghani participated, a proposed Letter of Understanding dated May 1, 1979 was prepared. (Uncontested Fact ¶ 15; Joint Exhibit 9)

26. The May 1, 1979 Letter of Understanding (May 1 Letter), which was prepared in early April 1979, stated, among other things, that "Mr. Taleghani has advised O'Brien & Gere that a disruption of Iranian banking operations, related to recent civil unrest in Iran, has prevented payment to date." The letter further provided:

2. Taleghani-Daftary agrees to make payment to O'Brien & Gere Engineers, Inc. in the amount of said $157,755.19 within fifteen days of resumption of banking operations in Iran and in accordance with the provisions of the parties' Agreement dated February 21, 1978. The parties agree that no interest will be due or payable to O'Brien & Gere Engineers, Inc. if said $157,755.19 is received by O'Brien & Gere on or before October 31, 1979. Otherwise, the parties agree that said sum, less any partial payments, will bear simple interest at the rate of 12% per annum or part thereof, commencing May 1, 1979.

(Joint Exhibit 9)

27. Johnson did not tell Taleghani that O&G Inc. thought that the letter of understanding imposed a grace period during which T–D could attempt to obtain payment from the Iranian government. Johnson also did not tell Taleghani that if the

Iranian government did not pay T–D, then O&G Inc. expected Taleghani to pay the amount from his personal funds. Johnson stated that he did not mention these points, although they represented his subjective understanding, because he did not want to offend Taleghani. (Testimony of Johnson)

28. At the time that Johnson negotiated and executed the letter of understanding he knew that Taleghani was a wealthy man who had enough assets in the United States to pay the amount owed to O&G Inc. (Testimony of Johnson)

29. Consistent with his belief that T–D was a partnership, the May 1 Letter was drafted by Johnson for signature by Taleghani and Daftary as partners of T–D. Thus the names "TALEGHANI–DAFTARY" and "O'BRIEN & GERE ENGINEERS, INC." appeared immediately below the body of the May 1, 1979 letter on the left hand and right hand sides of the page, respectively. Two signature lines appeared beneath the name "TALEGHANI–DAFTARY". Typed below one signature line was "Khalil Taleghani, Partner" and typed below the other was "Jamshed Daftary, Partner." The name "Peter C. Johnson, P. E. Division President," appeared below the signature line under the heading "O'BRIEN & GERE ENGINEERS, INC." (Testimony of Johnson; Joint Exhibit 9)

30. After signing four copies of the May 1 Letter, which he referred to as "the Letter of Understanding," Johnson transmitted these copies to Justin by letter dated April 3, 1979. Johnson requested in the April 3 transmittal letter that Messrs. Taleghani and Daftary execute the copies of the May 1 Letter and return one fully executed copy to O&G Inc. (Uncontested Fact ¶ 16; Joint Exhibit 10)

31. Justin, who had been a senior partner in the engineering firm, J–C, raised no question concerning the May 1 Letter's characterization of Taleghani and Daftary as partners in T–D. (Testimony of Justin and Johnson)

32. Following receipt of copies of the May 1 Letter, Taleghani reviewed its contents with Daftary who was then in Iran.

Daftary requested that reference in the first paragraph of the letter to "disruption of Iranian banking operations" and to "civil unrest in Iran" be deleted, that the phrase "within fifteen days of resumption of banking operations in Iran" in paragraph 2 be changed to "within fifteen days of the availability of funds," and that reference in that same paragraph to payment of interest be deleted because Iran's Islamic government disapproved of interest. Daftary's requested changes were communicated to Johnson who set about revising the May 1 Letter to comply with such requests. (Uncontested Fact ¶ 17)

33. Daftary requested the change to "availability of funds" because the reason payment was delayed was not the disruption of the banking operations, but rather, the reluctance of the government to pay T–D. (Testimony of Taleghani)

34. Neither Daftary nor Taleghani objected to the May 1 Letter's reference to them as partners of T–D. (Uncontested Fact ¶ 18)

35. Daftary's requested changes were incorporated into a revised Letter of Understanding dated March 31, 1979. (Uncontested Fact ¶ 19; Joint Exhibit 11)

36. As in the case of the May 1 Letter, the names "TALEGHANI–DAFTARY" and "O'BRIEN & GERE ENGINEERS, INC." appeared immediately below the body of the March 31 Letter on the left hand and right hand sides of the page, respectively. Two signature lines appeared beneath the name "TALEGHANI–DAFTARY." Typed below one signature line was "Khalil Taleghani, Partner" and typed below the other was "Jamshed Daftary, Partner." The name "Peter C. Johnson, P. E., Division President" appeared below the signature lines under the heading "O'BRIEN & GERE ENGINEERS, INC." (Joint Exhibit 11)

37. Johnson signed several copies of the March 31 Letter on behalf of O&G Inc. and forwarded these signed copies to Justin so he might arrange to obtain the signatures of Taleghani and Daftary. (Uncontested Fact ¶ 20)

38. As in the case of the May 1 Letter, Justin raised no question regarding the March 31 Letter's characterization of Taleghani and Daftary as partners in T–D. (Testimony of Justin and Johnson)

39. Sometime shortly before April 18, 1979, Taleghani signed the March 31 Letter without objecting to its reference to him as "Khalil Taleghani, Partner." (Uncontested Fact ¶ 21)

40. By letter dated April 18, 1979, Justin transmitted to Daftary in Iran copies of the March 31 Letter which had been executed by both Johnson and Taleghani. In his transmittal letter, Justin stated, among other things:

> Enclosed are copies of a letter from O'Brien & Gere Engineers, Inc. stating the sums due them for services for Taleghani-Daftary in connection with the Taleghan and Doroodzan projects. The total amount due is $157,755.19. Taleghani has signed copies of this letter. Will you please sign one copy of the letter and return to me for delivery to O'Brien & Gere. O'Brien & Gere will then release the Contract Documents and Final Report for Phase II of the Doroodzan project and the Status Report of Taleghan Project. We will then ship these documents and reproducible drawings to you.

(Uncontested Fact ¶ 22; Joint Exhibit 12)

41. On April 30, 1979, Daftary transmitted back to Justin a copy of the March 31 Letter which he had executed without objecting to its reference to him as "Jamshed Daftary, Partner." (Uncontested Fact ¶ 23; Joint Exhibit 13)

42. Consistent with the terms of the March 31 Letter, following receipt of a fully executed copy of that Letter in mid-May of 1979, O&G Inc. immediately delivered its work product, the "Doroodzan documents," to Justin. On May 25, 1979, O&G Inc.'s work product was forwarded by air freight to Daftary in Iran. (Uncontested Fact ¶ 24)

43. The March 31 Letter superseded the February 21 Agreement which had been suspended by T–D. It constituted a separate agreement between O&G Inc. and T–D in which T–D agreed upon the precise sum that was due and owing to O&G Inc. and promised to make payment in full within fifteen days of the availability of funds. In consideration for such promise, O&G Inc. obligated itself to deliver to T–D the work product for which it had not been paid. (Testimony of Johnson, Justin & Taleghani; Findings of Fact ¶¶ 24–28, 32, 33, and 35)

44. While reference to payment of interest was left out of the March 31 Letter, and the term "penalty" inserted in its place, the parties understood and intended that the "penalty" which would be due and payable to O&G Inc. if it did not receive by October 31, 1979 full payment—$157,755.19—was the interest provided for under the May 1 Letter—12% simple interest per annum, or part thereof, on the unpaid balance, commencing May 1, 1979. (Testimony of Johnson; Joint Exhibits 9 and 11; Finding of Fact ¶ 32)

45. Shortly before September 5, 1979, Justin, in his capacity as agent for T–D, suggested to Johnson that he, Johnson, should send a letter to T–D, care of Taleghani, canceling the February 21 Agreement and requesting that T–D pay O&G Inc. the amount of $157,755.19 as agreed in the March 31 Letter. Justin prepared a draft of the suggested letter which Johnson had retyped on O&G Inc. stationery in substantially the form it was prepared by Justin. This letter, which was dated September 5, 1979 and addressed to T–D, attention of Mr. Khalil Taleghani, was signed by Johnson and forwarded to Taleghani. (Testimony of Justin and Johnson)

46. On or about October 15, 1979, Johnson received a letter from Taleghani dated September 18, 1979. (Joint Exhibit 14)

47. On October 16, 1979, Johnson wrote to Taleghani replying to Taleghani's letter. (Joint Exhibit 15)

48. Upon receipt of Johnson's October 16, 1979 letter, Taleghani, for the first time, took exception to being referred to as a partner in T–D. In particular, Taleghani apprised Johnson of Taleghani's belief that

T–D was not a partnership. Rather, he said T–D was an "establishment," a form of non-commercial association provided for under Iranian law. According to Taleghani, under the terms of T–D's Articles of Association, his liability was limited to his paid-in capital. (Testimony of Taleghani; Joint Exhibit 15)

49. O&G Inc. thereafter demanded that Taleghani and Daftary as partners or putative partners in T–D, pay the sum due O&G Inc. Taleghani and Daftary refused although Taleghani had sufficient personal funds available to make such payment. (Testimony of Johnson and Taleghani)

50. Information about the present status of T–D is limited. Taleghani himself left Iran in December of 1978. He came to the United States on personal business and has not returned to Iran since then. After the ouster of the Shah's government, Daftary remained in Iran for a period of time. A committee appointed by the new government intervened to some extent in the management of T–D. Daftary eventually left Iran and was residing in Switzerland. After Daftary left, a managing director was appointed to run the entity subject to the control of the committee. At the time that Daftary left, the company was in arrears with respect to employee salaries and benefits. The payment awaited from the Iranian government had not been received. (Testimony of Taleghani; Joint Exhibit 14)

*Discussion*

The relationship of these contracting parties and the course of their business relationship has been detailed in the preceding findings of fact. The dispute between the parties turns upon the Letter of Understanding the final form of which was dated March 31, 1979. (March 31 Letter or Agreement)[1] The first issue is whether the defendant is bound to the agreement as a partner by estoppel. Because I conclude that the defendant is liable under that agreement as a partner, I reach the second issue: what are the terms of the agreement to which the defendant is bound. For reasons which follow, based upon the findings I have made, I conclude that the defendant is a partner by estoppel, but that funds are not yet available within the meaning of the terms of the March 31 letter. Based upon these conclusions, the defendant is personally liable for the "penalty" or interest referred to in the agreement.

*Partnership by Estoppel*

[1] Section 328(a)(1) of Title 59 of the Pennsylvania Consolidated Statutes sets out the circumstances under which one may be held liable as a partner by estoppel under Pennsylvania law. It provides:

> (1) When a person, by words spoken or written or by conduct, represents himself, or consents to another representing him to any one, as a partner in an existing partnership or with one or more persons not actual partners, he is liable to any such person to whom such representation has been made, who has, on the faith of such representation, given credit to the actual or apparent partnership . . . .

59 Pa.Cons.Stat.Ann. § 328(a)(1) (Purdon Supp.1980). Thus, under Pennsylvania law, the elements of partnership by estoppel are (1) a representation to a third party that one is a partner; (2) reliance upon that representation by the third party to whom

1. There was a prior agreement between the parties dated February 21, 1978. It provided that it would be "governed by and be construed in accordance with the laws, customs, duties and taxes of the United States of America" and that "any dispute or difference arising out of the Agreement, including those considered as such by only one of the parties, shall be finally settled under Arbitration Rules and Procedures of the International Chamber of Commerce." *See* Uncontested Fact ¶ 8; Joint Exhibit 3. Relying on this provision of the February 21, 1978 contract which he contended applied to disputes arising under the March 31 letter, Tale- ghani moved to stay this action pending arbitration. His motion raised issues about the relationship between the February 21, 1978 contract and the March 31, 1979 Letter of Understanding that could not be resolved as a matter of law. Immediately before the scheduled trial of the issues of fact relating to arbitration, Taleghani withdrew his motion to stay and asked this court to proceed to consider the merits of the dispute between the parties. *See* Memorandum and Order of December 8, 1980; Stipulation of Counsel, approved October 7, 1981. The plaintiff did not object and so, I proceeded to consider the merits of the dispute.

it was made; and (3) the extension of credit by such party in reliance upon the representation. *See Lazarus v. Goodman,* 412 Pa. 442, 195 A.2d 90 (1963); *see generally* 1 Rowley on Partnership § 16.1, at 424 (2d 1960); Painter, *Partnership by Estoppel,* 16 Vanderbilt L.Rev. 327–28 (1963). O&G Inc. has proven each of these elements by a preponderance of the evidence.

■ The preponderance of the evidence establishes that Taleghani and Daftary by words, spoken and written, and by their conduct represented themselves to O&G Inc. to be partners in an existing partnership. The oral representations made by Taleghani to O&G Inc.'s Williams and Johnson that he and Daftary were partners, coupled with the use of a firm name on letterheads and legal documents which consisted entirely of their two names alone constituted a representation by Taleghani and Daftary that they were partners. *See Lazarus v. Goodman,* 412 Pa. 442, 195 A.2d 90 (1963); *Oswald Machinery Co. v. Farnsworth and Ebert,* 101 Pa.Super. 506 (1930); and *Daniel v. Lance,* 21 Pa.Super. 474 (1902). The written representations in the September 1977 letter to Williams and in the March 31 Letter of Understanding that Taleghani and Daftary were partners justify the conclusion that they represented themselves to be partners.

Taleghani's contention that he was unaware of the significance of his representations to O&G Inc. that he was a partner in T–D is immaterial. Where a defendant represents himself to be a partner, either by words or conduct, "it is immaterial that the defendant may secretly deny to himself all connection with the partnership, or even that he is unaware of the significance of his behavior, if his outward conduct is such that others believe him to be a partner." Painter, *supra,* 16 Vanderbilt L.Rev. 327–28 (1963). It is sufficient under the Pennsylvania statute and the earlier decisions which the statute codifies that the defendant knowingly held himself out to be a partner. *Bing v. Schmitt,* 226 Pa. 622, 75 A. 854 (1910); *Drennen v. House,* 41 Pa. 30 (1862); *Denithorne v. Hook,* 112 Pa. 240, 3 A. 777 (1886). In addition to the references

by Justin to Taleghani as a partner, Taleghani himself referred to Daftary as his partner when writing to O&G Inc. about the establishment of a Philadelphia office for T–D. In addition, Taleghani twice executed, without objection, agreements which identified him as a partner. The burden should not fall on the defendant because Taleghani made these representations without being aware of their consequences. The evidence establishes that plaintiff, O&G Inc., acting through Williams and Johnson, reasonably believed the representations of Taleghani and Daftary that they were partners in T–D. Until Taleghani's disclaimer after receipt of Johnson's October 16, 1979 letter, there was no basis for O&G Inc.'s representatives to believe otherwise. The fact that O&G Inc. believed that T–D was a partnership is evidenced by the drafts of the letters of understanding they prepared which both referred to Taleghani and Daftary as partners. This belief was reasonably held in light of Justin's and Taleghani's numerous references to Taleghani and Daftary as partners.

The final element that must be established to impose partnership liability by estoppel is the extension of credit in reliance upon the representations. In addressing this element, I have considered the terms of the March 31 letter, which will be discussed in greater detail in the second part of this opinion. The following facts suffice to support the conclusion that this element of partnership by estoppel is satisfied. Upon finishing work it had been directed to complete, O&G Inc. refused to turn over its work product to T–D until T–D's two putative partners signed the March 31 letter agreement specifying the amount owed O&G Inc., when that sum would be paid, and when and under what terms interest would be paid. After the agreement had been signed by Taleghani and Daftary, O&G Inc. promptly turned over its work product to T–D on the strength of the representations made by Taleghani and Daftary in that letter. In doing so, O&G Inc. changed its position and extended credit to T–D just as surely as a manufacturer

extends credit to a customer when, rather than demanding cash upon delivery, he delivers his product on the strength of the customer's promise to pay.

Thus, all the elements of a partnership by estoppel have been met. The defendant is liable under the March 31 letter agreement as a partner would be. The inquiry is not ended, however, because the rights and liabilities imposed by the agreement upon O&G Inc. and the putative partners remain to be determined.

*The March 31 Letter of Understanding*

■ It is axiomatic that the personal assets of each partner are at risk for the satisfaction of the obligations of the partnership. 59 Pa.Cons.Stat.Ann. § 327 (Purdon Supp.1980). However, this rule does not operate to deprive partners of the benefits of their bargains. The terms of each obligation must still be determined and only upon those terms will each partner be liable to a third party to the extent of the joint obligation or his personal wealth.

■ Where the parties have placed their agreement in writing it will be enforced in accordance with the intention of the parties as that intention is expressed in or can be fairly implied from their writing when interpreted in light of all the pertinent evidence. 4 S. Willison, *Contracts* § 600A, at 286 (3d ed. W. Jaeger 1961). *See also id.* § 610, at 499–500. Thus, the actual, subjective intent of either party is irrelevant. As comment b to § 226 of the Restatement (Second) of Contracts (Tent. Draft No. 5 1970) states: "the intention of a party that is relevant to formation of a contract is the intention manifested by him rather than any different undisclosed intention." In determining the manifest intention of the parties, the common or normal meaning will be given to the words of the contract unless the circumstances show that a special meaning should be attached. *Easton v. Washington County Insurance Co.*,

391 Pa. 28, 137 A.2d 332 (1957); 4 S. Willison, *supra*, § 618, at 705. The agreement should be read as a whole and every part should be interpreted with reference to the whole and, if possible, so to give effect to the general purpose. *Pritchard v. Wick*, 406 Pa. 598, 178 A.2d 725 (1962). While the intention of the parties is to be determined from the final agreement executed by them, previous drafts of a written agreement, negotiations, and circumstances may be considered in determining the meaning of specific words and clauses. *Selig v. Philadelphia Title Insurance Co.*, 380 Pa. 264, 111 A.2d 147 (1955); *Gianni v. R. Russell & Co., Inc.*, 281 Pa. 320, 126 A. 791 (1924). As the drafters of the Restatement (Second) of Contracts observed: "Words . . . cannot apply themselves to the subject matter. The expressions and general tenor of speech used in negotiations are admissible to show the conditions existing when the writing was made, the application of the words, and the meaning or meanings of the parties." Restatement (Second) of Contracts § 240, comment b (Tent. Draft No. 5 1970). Having determined that Taleghani is liable under the March 31 letter agreement as a partner, I will now apply these rules of contract interpretation to determine the rights and obligations created by the agreement.

■ The pertinent portion of the March 31 letter agreement provides that T–D will pay to O&G Inc. the agreed upon sum "within fifteen days of the availability of funds." The agreement further provides that no penalty would be added if the amount is paid by October 31, 1979. The term "availability of funds" is not explained in the agreement. However, evidence of an earlier draft sheds light on the meaning of the phrase.[2] The first draft of the letter of understanding required payment within fifteen days of "resumption of banking operations in Iran." When Tale-

---

**2.** It is undisputed that the first draft of the letter of understanding is dated May 1, 1979. The next version of the letter of understanding which is the one the parties executed is dated March 31, 1979. The parties agree that they

have no explanation for why the draft is dated later than the executed agreement, however, they also agree that this difference is not significant.

ghani discussed this draft with Daftary, Daftary protested that this was not the proper contingency upon which to base the obligation to pay. According to Daftary payment to T–D was not delayed by the disruption of banking but rather the inaction of the government. According to Taleghani, they sought to change the language to "availability of funds" to make payment under the March 31 letter contingent upon the Iranian government paying T–D for any of the work T–D had performed but for which it had not yet been paid. Once this happened, T–D would have funds available to pay O&G Inc. for the work O&G Inc. released to T–D when the March 31 letter was executed. Accordingly, Taleghani requested that the contingency be changed from "resumption of banking operations" to "availability of funds." Thus, availability of funds in the March 31 letter agreement means that when payment is due when as a result of receiving payment from the Iranian government T–D has funds available in sufficient quantity to pay the debt owed to O&G Inc.

This interpretation of the contract is consistent with other evidence that T–D was awaiting payment of about $80,000 from the Iranian government even before the March 31 letter was signed. After the work covered by the March 31 letter was delivered, T–D would be entitled to even more from the government. Thus, it was reasonable to make payment by T–D to O&G Inc. due as soon as T–D had funds available as a result of its being paid by the Iranian government. In addition, this interpretation of the contract takes into consideration the earlier draft and offers a logical explanation for the change of language between the earlier draft and the completed contract. It is consistent with the credible testimony of Mr. Taleghani and the plausible objections of Daftary to the May draft.

The plaintiff's interpretation of the meaning of the phrase "availability" in the March 31 letter is not convincing. According to the plaintiff, the phrase meant within fifteen days of the time either of the partners had the amount available to them. Taleghani testified that at the time he signed the agreement he had available sufficient personal funds to pay the debt. The plaintiff's employees testified that they knew that Taleghani was a wealthy man. The plaintiff does not contend that Taleghani told them or they believed that he did not have personal funds available equal to the amount of the debt at the time the March 31 letter was signed. There is no contention that Taleghani lacked *personal* funds because of the disruption of banking in Iran. For these reasons, I have found from the evidence, particularly the testimony of Johnson of O&G Inc., that at the time the March 31 letter agreement was executed plaintiff knew that Taleghani had available personal funds sufficient to pay the debt. In light of this fact, the plaintiff's interpretation of the contract is that "within fifteen days of the availability of the funds" was simply a different way of saying within fifteen days of the date of the contract. This was the thrust of Johnson's testimony. He testified that he understood the contract that he executed with the defendants to require payment of the full amount shortly after the contract was signed. He further testified that it was his understanding that in spite of its right to immediate payment, O&G Inc. had graciously agreed to give the defendants several months to try to get the money from Iranian sources before O&G Inc. would expect payment from the partners personal assets.[3]

Plaintiff's interpretation of the "availability" term of the contract violates one of the fundamental rules of contract construction. As I noted at the outset of this section, a contract should be interpreted so that every word has meaning. Plaintiff contends that because the partners had

---

**3.** Johnson equivocated when pressed for a statement of the length of time O&G Inc. was willing to wait. He was, at times, unwilling to say that O&G Inc. was to wait until October 31, 1979 for payment although this is the only future date mentioned in the parties' written agreement.

funds available at the time the contract was made, the intended meaning of the phrase "availability of funds" was that the amount was immediately due. This interpretation renders the words "availability of funds" superfluous. This interpretation is also inconsistent with its earlier willingness to await the resumption of banking operations in Iran before payment would be due. Surely, the defendants were not requesting a harsher standard when they asked that the phrase be changed to "availability of funds."

Plaintiff's contention that the agreement merely gave the defendants a grace period of several months is at odds with the interest clause of the draft and the penalty clause of the final agreement. According to the plaintiff, the agreement was that the partners owed the amount now but O&G Inc. would wait for "the availability of funds" or several months to pass, whichever came first. Once one of the preceding occurred, the plaintiff's argument continues, either T–D or the putative partners were to pay the debt. The plain language of the agreement envisions a very different scenario. The agreement calls for payment of the sum upon the availability of the funds and if the funds have not become available (and therefore, payment has not been made) by October 31, 1979, then T–D would be liable for a penalty. This scenario is consistent with the scheme of the May draft except that resumption of banking operations was changed to "availability of funds" and interest at 12% was changed to a "penalty." No amount of liberal interpretation of this agreement or the preceding draft would yield an agreement resembling the one described by Johnson as the agreement between O&G Inc. and Taleghani and Daftary.

After careful review of all the evidence, it is apparent to me that the plaintiff's error is that it confuses ultimate truth with earlier design. Johnson described the contract he intended to negotiate, not the contract for which the plaintiff settled when it executed the March 31 letter. Why the plaintiff settled for less than its earlier design may be explained by Johnson's concern about offending Taleghani and this language from the March 31 letter agreement: "The parties have entered into this Understanding in consideration of their long-standing and favorable relationship and a mutual desire to renew prosecution of the subject Projects to completion at the earliest practicable time." Continued business in Iran was still sufficiently possible and important to O&G Inc. that they were willing to agree to await payment, first, until banking operations resumed and later, until T–D had funds available as a result of its receiving payments owed to it by the Iranian government.

■ The plaintiff does not contend that the funds are "available" as I have interpreted that phrase. Because Taleghani is a partner by estoppel he is personally liable for the "penalty" that became due on October 31, 1979. The meaning of the word "penalty" is disputed. The May draft provided that if the amount was not paid by October 31, 1979 then the defendants would owe the plaintiff simple interest from May 1, 1979 at the rate of 12% per annum. Daftary's objection was to the word "interest" and not to the amount per se. He insisted that the word interest and the statement of a percent be eliminated because the new Iranian government did not permit interest charges. In place of the interest clause of the May draft, the March 31 letter agreement provided "no penalties will be due or payable to O'Brien & Gere Engineers, Inc. if said $157,755.19 is received by O'Brien & Gere on or before October 31, 1979." Taleghani's contention that the parties never reached agreement about the percent of interest is not supported by the record. In his own testimony, he said that he only requested the deletion of the words of the earlier interest clause. The manifest intention of the parties when adopting the "penalty" language was to adhere to the interest terms suggested by O&G Inc. in the May draft but to avoid mention of them. Accordingly, I conclude that because O&G Inc. was not paid on October 31, 1979, as a partner, Taleghani is personally liable for simple interest on the amount at 12% from May 1, 1979.

A number of questions remain to which the parties did not address themselves either through the presentation of evidence or argument. For instance, did the parties anticipate the worsening of civil unrest in Iran; was it a basic assumption of their agreement that the instability of the new government would subside and business as usual would resume; did they contemplate the possibility of the present situation in which they find themselves but decide that O&G Inc. would bear the risk of the non-occurrence of the availability condition; would Pennsylvania law follow the provisions of the Restatement (Second) of Contracts and the principles of the Uniform Commercial Code by analogy and provide a remedy for frustration of purpose in this case. Without a presentation by counsel, I cannot approach these issues. It may be that the parties cannot yet say whether performance has been frustrated by "the occurrence of an event the non-occurrence of which was a basis assumption on which the contract was made." Restatement (Second) of Contracts § 281 (Tent. Draft No. 9 1974)

## CONCLUSIONS OF LAW

1. The defendant Taleghani is a partner by estoppel and liable for the debt of Taleghani-Daftary on the March 31, 1979 letter agreement as a partner would be.

2. Under the terms of the March 31, 1979 letter agreement to which Taleghani is bound as a partner, the principal amount is not yet due because the funds are not available within the meaning of the contract.

3. Because the principal amount was unpaid on October 31, 1979 and remains so, Taleghani is liable to the plaintiff for simple interest at a rate of 12% per annum on the amount of $157,755.19 from May 1, 1979.