Charles W. BLACK, Roderick K. Blacker and Edward T. Serle, for themselves and all other persons similarly situated, Plaintiffs-on-Intervention, Appellees,

v.

FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF FARGO, NORTH DAKOTA, F.A., Defendant/Plaintiff on Counterclaim and Cross-claim, Appellee,

v.

LA PLATA MEDICAL CENTER ASSOCIATES, LTD., a Colorado limited partnership and Thomas Usher, Defendants/Third–Party Plaintiffs, Appellants,

v.

LA PLATA COUNTY HOSPITAL DISTRICT, a Colorado Special District, Third–Party Defendant/Defendant-on-Intervention, Appellee.

No. 90CA0227.

Colorado Court of Appeals,
Div. IV.

Feb. 27, 1992.

As Modified on Denial of Rehearing
April 30, 1992.

Certiorari pending June
16, 1992 (92SC352).

Mosley, Wells, Johnson & Ruttum, P.C., James H. Mosley, Joseph B. Dischinger, Denver, for plaintiffs-on-intervention, appellees.

Burns, Wall, Smith and Mueller, P.C., George W. Mueller, Denver, Frank J. Anesi, Durango, for defendant/plaintiff on counterclaim and cross-claim, appellee.

Carl H. Seeliger, Jr., Denver, Colo., William F. Skewes, Hughs & Dorsey, Susan Linsley, Denver, for defendants/third-party plaintiffs, appellants.

McDaniel McDaniel Baty & Nicholson, Gerald B. McDaniel, Durango, for third-party defendant/defendant-on-intervention, appellee.

Opinion by Chief Judge STERNBERG.

The La Plata County Hospital District (the District) was formed in 1959 pursuant to § 32-1-101, et seq., C.R.S., and a hospital was constructed. In the late 1970's, the District decided to construct a medical office building in an effort to encourage more doctors to use the hospital by providing attractive office space in close proximity. After unsuccessful efforts to arrange financing, the District entered into a limited partnership, La Plata Medical Center Associates, Ltd. (LPMCA), the purpose of which was to finance and construct the office building on land owned by the District.

The District was a limited partner, and Thomas J. Usher and Walter Meserole were both limited and general partners. Following default on the permanent loan, this complex litigation arose, and Usher and LPMCA appeal district court judg-

ments finding them, but not the District, liable to the lender, First Federal Savings and Loan Association of Fargo, North Dakota (First Federal), for the deficiency on a promissory note and for fraud. We affirm.

LPMCA leased the land from the District for one dollar annually under a ninety-nine year ground lease requiring LPMCA to construct a medical office building. The lease also provided that the District could purchase the building after seven years.

Acting through the general partners, LPMCA obtained a $2,300,000 construction loan, with repayment also personally guaranteed by the District and the general partners. In addition, the District and the general partners personally guaranteed a tenant finish loan for $365,000 to LPMCA, obtained from the United Bank of Durango. The collateral for this loan was a five-year master lease, executed in October 1983. Under its terms, the District agreed to rent the building from LPMCA for $410,000 the first year, with annual increases thereafter.

The District expected to fulfill its obligations under the master lease by renting space in the office building to physicians. However, the general partners signed an agreement with the District, authorizing an annual rental credit of $100,000 in the event the District was unable to rent all the office space. The master lease was recorded, but the rental credit agreement was not.

In early 1984, LPMCA obtained a commitment for a permanent loan from Camelback Mortgage Corporation (Camelback). The proceeds were to be used to pay off the construction loan and all but $65,000 of the tenant finish loan.

Initially, Camelback declined to make the loan because the appraisal of the medical office building fell below its required loan to value ratio; but, after LPMCA submitted a copy of the master lease to the appraiser, he increased the appraised value. He did so, however, without knowledge of the rental credit agreement which, by reducing the value of the master lease, would have lowered the appraised value of the building by $500,000.

Although the commitment letter specifically required the general partners to provide fully executed copies of the master lease, including "all amendments and exhibits and all other appropriate attachments," they did not inform Camelback or First Federal of the rental credit agreement prior to the funding of the loan.

In February 1984, First Federal agreed to purchase the loan. At Camelback's request, First Federal waived its requirement that the general partners personally guarantee the loan. The loan was funded in March 1984, when the general partners, acting for LPMCA, executed a note and a deed of trust, pledging the ground lease as collateral. At the same time, the District signed an agreement subordinating its leasehold interests under the ground lease and the master lease to the interests of the mortgagees. In the subordination agreement, the District indicated that the leases, as recorded, constituted the entire lease agreement affecting the property.

Camelback continued to service the loan in accordance with an agreement with First Federal which contained Camelback's promise "to repurchase any mortgage covered by this agreement within 18 months after date of Buyer's remittance if any misstatement of material fact, intentional or otherwise, is disclosed...."

In early 1985, LPMCA defaulted on the note. First Federal and Camelback learned about the rental credit agreement in August, and First Federal gave LPMCA notice of acceleration.

In October, United Bank of Durango sued LPMCA and the general partners on its note, and First Federal was permitted to intervene. At the same time, the District filed a petition for declaratory and injunctive relief seeking to have the limited partnership agreement, the ground lease, and the master lease declared void. The two cases, involving numerous cross-claims and counterclaims, were consolidated in February 1986.

Thereafter, First Federal successfully moved to dismiss on the grounds that the District lacked standing, but Charles W.

Black, Roderick K. Blacker, and Edward T. Searle (taxpayers) were permitted to intervene, and both parties moved for summary judgment.

In April 1987, the court granted First Federal summary judgment, requiring specific performance of Camelback's promise to repurchase the mortgage under the terms of the servicing agreement. It held that Camelback had misstated the amount of the annual rental under the master lease when it did not inform First Federal of the rental credit agreement and that this misstatement was material because First Federal would not have purchased the loan if it had known about the rental credit agreement. It further held that, although the misstatement was "innocent," Camelback was nevertheless accountable to First Federal under the terms of the servicing agreement. The court entered judgment against Camelback for $3,704,641.33, plus continuing interest, until the judgment was paid, but it granted a stay of execution of the judgment pending the outcome of the remaining litigation.

The court then granted partial summary judgment in favor of the intervening taxpayers finding: 1) that the limited partnership agreement was void as to the District; 2) that the ground lease from the District to LPMCA was void; 3) that the master lease from LPMCA to the District was void; and 4) that the District had no liability for debts incurred by LPMCA. Consequently, only the general partners and LPMCA remained liable on the note to First Federal.

All remaining claims were consolidated and tried before the court, which rendered judgment in favor of First Federal and Camelback against the general partners and LPMCA, but not against the District. Specifically, the court entered judgment on the Camelback note "in the sum of $2,936,-054.60, plus interest in the amount of $898,-324.44, less $175,000 as rental received by First Federal ... plus a per diem amount of interest of $1,070.43 from November 24, 1987, plus attorneys' fees and costs to be determined at a later hearing." It entered judgment for fraud in the same amounts.

All claims against the District were dismissed with prejudice, except those concerning an equitable remedy which the court proposed to fashion to resolve the issue of unjust enrichment.

This remedy, announced in November 1989, awarded First Federal $1,140,000 against the District, based on the value of the property at the time of the judgment. It permitted the District to satisfy the judgment either from the proceeds of a refinancing or by conveying title to the medical office building to First Federal. The court granted the claims of the general partners and Camelback against the District only to the extent that they were entitled to a credit or offset in their favor in those judgments previously awarded to First Federal, and it denied the claim of United Bank of Durango for a participating share of the equitable remedy.

The District opted to refinance and purchase the building; however, when it failed to make payment, the court found the District in contempt and vested title to the building in First Federal.

Usher and LPMCA filed a notice of appeal, which the taxpayers sought to have dismissed, asserting that because Usher had previously filed a petition in bankruptcy, he lacked standing. We denied this motion, but granted leave to raise the issue in the briefs on the merits. Camelback and First Federal entered into a settlement agreement whereby Camelback assigned its rights against LPMCA and the general partners to First Federal. Meserole did not appeal.

In 1991, First Federal was placed into receivership and a new entity was formed. Thereafter, this court granted a motion substituting the new entity as a party.

### I. Standing

■ As a threshold matter, we reject the taxpayers' contention that because Usher petitioned for bankruptcy protection prior to filing this appeal, only the bankruptcy estate had standing to bring the appeal.

■ The commencement of a bankruptcy case creates an estate comprised of all le-

gal or equitable interests of the debtor in property. 11 U.S.C. § 541 (1989). Causes of action belonging to the debtor are property of the estate, and only the trustee has standing to assert them. *Folz v. Bancohio National Bank*, 88 B.R. 149 (S.D.Ohio 1987). However, a trustee is not bound to accept a cause of action which does not offer the promise of a benefit to the estate, 11 U.S.C. § 554(a)(1989), and the court may order the trustee to abandon such property. 11 U.S.C. § 554(b)(1989). When the bankruptcy court orders property to be abandoned, title reverts to the debtor. *Barletta v. Tedeschi*, 121 B.R. 669 (N.D.N.Y.1990).

Here, both the claims against Usher and his counterclaims became property of the bankruptcy estate at the time he filed for Chapter 11 protection in May 1987, and as debtor-in-possession, he had authority to pursue these claims. 11 U.S.C. §§ 1106, 1107 (1989). Judgments followed over a period of two years, and the claims were not deemed final until November 1989, when the trial court entered its order concerning the equitable remedy for First Federal. Thus, no appeal could be filed until that time.

Usher filed a timely appeal in February 1990, two months after his bankruptcy case was converted to Chapter 7. The taxpayers argue that, after this conversion, only the trustee could file an appeal. However, in *Emerson v. A.E. Hotels, Inc.*, 403 A.2d 1192 (Me.1979), plaintiffs who filed a trespass action and thereafter sought bankruptcy protection were not barred from prosecuting the action when the trustee did not do so. The court held that:

> It is not a necessary consequence of the trustee's having title to the right of action that the plaintiffs lost power, or authority, to continue to prosecute an action instituted by them prior to the commencement of bankruptcy proceedings.... Although the trustee may intervene and assume control of the suit if he wishes, if the trustee takes no action the bankrupt has the power to continue with his suit.

Here, the appeal was the final step in an action initiated prior to the commencement of Usher's bankruptcy case. Usher was entitled to file the appeal when the trustee, who had the power to pursue it on the estate's behalf, did not do so. Furthermore, in April 1991, the court ordered the trustee to abandon the appeal. Consequently, the right to the appeal was again vested in Usher, giving him standing to assert it here.

## II. Summary Judgment

Usher and LPMCA contend that the trial court erred in finding the ground lease and master lease void and in finding the limited partnership void as to the District. Alternatively, they argue that if the court properly determined that the leases and partnership were void, they, as well as the District, should be relieved of liability. We find no error.

### A.

■ A special district has the power to enter into contracts and agreements affecting its affairs. Section 32–1–1001, C.R.S. (1991 Cum.Supp.). However, if a special district's contract is beyond the scope of its constitutional or statutory powers, the contract is *ultra vires* and, consequently, void. *See* 10 E. McQuillin, *Municipal Corporations* § 29.02 (3rd ed. rev. vol. 1990).

■ A limited partner may transact business with the limited partnership, and, subject to other applicable law, the partner has the same rights and obligations as a person who is not a partner. Section 7–62–107, C.R.S. (1986 Repl.Vol. 3A).

■ In executing the ground lease and the master lease, the District acted both as a special district and as a limited partner. As a limited partner, it was entitled to contract with itself as a special district; however, the court determined that the transactions were unconstitutional.

■ The court found that the master lease contract created an unconstitutional "debt by loan" in violation of Colo. Const. art. XI, § 6. Usher and LPMCA argue that the master lease was simply a covenant to pay rent in the future, creating a

contingent obligation and not a debt by loan.

Colo. Const. art. XI, § 6, provides that:

No political subdivision of the state shall contract any general obligation debt by loan in any form ... except by adoption of a legislative measure.... [N]o such debt shall be created unless the question of incurring the same be submitted to and approved by a majority of the qualified taxpaying electors voting thereon....

■ Constitutionally prohibited debt is created when "one legislature, in effect, ... obligate[s] a future legislature to appropriate funds to discharge the debt created by the first legislature." *In re Interrogatories by Colorado State Senate Concerning H.B. No. 1247*, 193 Colo. 298, 566 P.2d 350 (1977).

However, not all governmental financial obligations extending beyond the elective term of a governing body constitute a debt by loan:

[S]ome of the indications of a debt in the constitutional sense are that the obligation pledges revenues of future years, that it requires use of revenue from a tax otherwise available for general purposes, that it is a legally enforceable obligation against the state in future years, or that appropriation by future legislatures of monies in payment of the obligation is nondiscretionary.

*Glennon Heights, Inc. v. Central Bank & Trust*, 658 P.2d 872 (Colo.1983).

■ Financing methods involving lease-purchase or multi-year lease agreements are constitutional if the local or state government annually can choose not to renew the lease agreement without further obligation. If nothing in the agreement limits the discretion of the legislative body, there is no debt by loan. *See Glennon Heights, Inc. v. Central Bank & Trust*, *supra* (a lease-purchase agreement providing for an original lease term of one year and consecutive annual renewal terms does not create debt by loan); *Gude v. City of Lakewood*, 636 P.2d 691 (Colo.1981) (a multi-year lease agreement providing that rental obligations are contingent upon the exer-

cise of annual renewal options does not create constitutionally prohibited debt).

Applying the reasoning in these cases, we conclude that the master lease between the District and LPMCA violates the constitutional prohibition against governmental debt by loan. The District leased the medical office building from LPMCA for a five-year term and incurred monthly rental obligations. Because the lease contained no provision for cancellation by the District during the five-year term, appropriation of monies by the District to meet the rental obligation was nondiscretionary. And, although the District planned to pay the rent by using revenues derived from subleasing the building to physicians, it was obligated to LPMCA whether or not such revenue was available. Thus, it is possible that the lease arrangement would require use of revenue from taxes otherwise available for general purposes.

■ Usher and LPMCA also argue that because the members of the District's governing board have staggered terms, their contracts cannot be deemed to bind or restrict their successors in office and that, consequently, they do not create a debt by loan. They cite no authority for this proposition, and we are aware of none.

We hold that the master lease created a debt by loan in violation of Colo. Const. art. XI, § 6. Consequently, the District's contract as lessee was *ultra vires* and therefore void.

■ We also agree with the court's determination that the limited partnership agreement was void as to the District. General partners are agents of the partnership, and they may bind it when they act within the scope of their authority. Section 7-60-109, C.R.S. (1986 Repl.Vol. 3A). A limited partner becomes liable for the obligations of the partnership if he participates in the control of the business. Section 7-62-403, C.R.S. (1986 Repl.Vol. 3A).

Here, the general partners, acting for LPMCA within the scope of their authority, executed a lease binding the District, in its capacity as a limited partner, to a contract which violated the constitutional prohibi-

tion against a debt by loan. If the District had objected to this contract, it would have risked forfeiting its protection as a limited partner, by participating in the control of a business.

We hold that, because it could not maintain its position as a limited partner and at the same time protect itself from becoming a party to an *ultra vires* contract, the District's participation in the limited partnership is void. Consequently it is not liable for the debts and obligations incurred by LPMCA.

### B.

■ Usher and LPMCA next contend that if the court correctly determined that the limited partnership was void as to the District, it also should have found that the general partners had no liability. In their view, First Federal's recovery should be limited to its equitable remedy against the District for unjust enrichment. They argue both that the limited partnership agreement was void as an illegal contract and that the limited partnership itself was dissolved *ab initio* when the court declared the ground lease and master lease void. We disagree.

■ The doctrine of illegality of contracts prevents a party to an illegal bargain from recovering damages for breach thereof and applies only to parties to the contract who are seeking to gain a benefit through the use of the courts. *Board of County Commissioners v. Pfeifer*, 190 Colo. 275, 546 P.2d 946 (1976).

However, the enforceability of the limited partnership contract between the general partners and the District is not at issue here. Rather, we are concerned with the question of whether LPMCA existed at the time it incurred a contractual obligation to First Federal and, if so, the extent of the liability of the general partners on that obligation.

■ A limited partnership is formed when there is a good faith, substantial compliance with the statutory requirement to execute and file a certificate of limited partnership in the office of the secretary of state. Section 7–62–201, C.R.S. (1986 Repl. Vol. 3A); 2 Z. Cavitch, *Business Organizations* § 39.05 (1984). Public recordation of the certificate protects third persons who deal with the partnership. Section 7–62–208, C.R.S. (1986 Repl.Vol. 3A). *See also Klein v. Weiss*, 284 Md. 36, 395 A.2d 126 (1978).

Here, a certificate of limited partnership was properly filed, and there is no evidence to suggest that either the District or the general partners lacked a good faith belief that they had substantially conformed with the statutory requirements for creating a limited partnership. When First Federal funded the loan to LPMCA, it was entitled to rely on the certificate as evidence that LPMCA was in existence. Thus, at the time LPMCA's obligation to First Federal arose, the partnership and limited partnership statutes concerning liability to creditors applied.

■ A limited partner who does not participate in the control of the business is liable to third persons only to the extent of his contribution. Section 7–62–403, C.R.S. (1986 Repl.Vol. 3A). However, the liability of a general partner is the same as for partners in a partnership without limited partners. Section 7–62–403, C.R.S. (1986 Repl.Vol. 3A). Thus, general partners are jointly and severally liable for all debts and obligations of the partnership. Section 7–60–115, C.R.S. (1986 Repl.Vol. 3A). Furthermore, general partners are estopped to deny the validity of contracts and deeds which they enter into if the limited partnership received the full benefit and use of the proceeds for the purposes intended. *In re Harbor Pointe Office Park, Ltd.*, 83 Bankr. 44 (D.Colo.1988).

■ A limited partnership is dissolved upon the happening of events specified in writing in the partnership agreement or upon an event of withdrawal of a general partner. Section 7–62–801 C.R.S. (1986 Repl.Vol. 3A). However, the dissolution does not of itself discharge the existing liability of any partner. Section 7–60–136 C.R.S. (1986 Repl.Vol. 3A).

In its summary judgment, the court stated that: "[i]f the Hospital District exercised control over the partnership and acted as a general partner ... then any liability resulting ... is prohibited." However, Usher and LPMCA make no claim in their briefs that the District participated in the control of LPMCA. Thus, even if the court had not determined that the limited partnership agreement was void as to the District, its liability would have been limited to the extent of its contribution to the limited partnership. In fact, under the court's equitable remedy, the District was held liable to this extent.

At the time LPMCA's obligation to First Federal arose, all parties contracted in accordance with their belief, based on the certificate filed pursuant to § 7–62–201, that a limited partnership existed. Therefore, the general partners were jointly and severally liable when they executed the note and deed of trust for LPMCA to First Federal. Additionally, because LPMCA benefited from the proceeds of the loan, the general partners are estopped to deny the validity of their acts on behalf of LPMCA. *See In re Harbor Pointe Office Park, Ltd., supra.* Finally, regardless of the time at which the limited partnership was actually dissolved, the general partners were not relieved of their personal liability for the partnership's obligations by virtue of the dissolution.

Consequently, we hold that the court did not err in declaring the limited partnership void as to the District, but not as to the general partners.

### III. Trial

Usher and LPMCA claim that the court erred during the trial stage of the proceedings: 1) by denying their motion to dismiss; 2) by finding the general partners personally liable even though they had not been required personally to guarantee the note; 3) by finding that the evidence supported the charge of fraud; 4) by applying an improper measure of damages; and 5) by entering duplicative and excessive judgments. We find no error.

### A.

At the beginning of the trial to the court, Usher and LPMCA moved to dismiss, asserting that on the grounds of illegality and mutual mistake of law, First Federal had failed to state a claim. The court rejected their motion because these affirmative defenses were not raised in their pleadings. Furthermore, it stated that even if it were to consider these defenses, it would not find that the general partners were relieved of liability.

Based on our disposition of the issue of the general partners' liability, in which we affirm the court's finding that the general partners, but not the District, were liable under the partnership agreement, we need not address this contention.

### B.

 Usher and LPMCA next claim that the general partners were not personally liable on the note. They reason that by declining personally to guarantee LPMCA's note, the general partners gave First Federal notice of their intent not to be bound as general partners and that First Federal's waiver of its guarantee requirement constituted its acceptance of this total restriction on the general partners' liability.

They cite *Union Bank v. Dorn,* 254 Cal. App.2d 157, 61 Cal.Rptr. 893 (1967), in which the court held that guarantors, who were also partners in a partnership liable for a construction loan, were entitled to protection under the state's anti-deficiency statute. The court concluded that the guarantors were "nothing more than principal obligors under another name" and that "liability as a guarantor adds nothing to the primary liability of a principal obligor."

However, this view is not universally accepted. *See Mandan Security Bank v. Heinsohn,* 320 N.W.2d 494 (N.D.1982) (a partner who personally guarantees payment of a partnership debt has changed the nature of his obligation on that debt, and the anti-deficiency statute does not preclude recovery on the individual guarantee). Furthermore, although the court in

*Union Bank* held that a personal guarantee did not add to the liability of a principal obligor, it did not conclude that the absence of a personal guarantee negates such liability.

■ The general rule is that partners are jointly and severally liable for all debts and obligations of the partnership. Section 7–60–115(1)(b), C.R.S. (1986 Repl.Vol. 3A). However, partners and creditors may expressly agree to limit the liability of partners for the debts of the partnership, *Demas v. Convention Motor Inns*, 268 S.C. 186, 232 S.E.2d 724 (1977), and the terms of each obligation must be ascertained to determine the extent of the partners' liability. *O'Brien & Gere Engineers, Inc. v. Taleghani*, 525 F.Supp. 750 (E.D.Pa.1981).

In *Demas v. Convention Motor Inns, supra,* a partnership agreement specifically limited certain partners' liability on a construction loan to their percentage shares in the partnership. The court held that by requiring only the remaining partners personally to endorse the note, the mortgagees accepted the limitation on liability. However, it "reserve[d] comment on attempted constrictions of partnership liability beyond the percentage shares of investment in the partnership...."

Here, Usher and LPMCA claim that the general partners were totally relieved of their liability on LPMCA's note when First Federal waived its personal guarantee requirement. At trial, however, an officer of First Federal testified that he and other officers did not seek personal guarantees because they considered it redundant in view of Usher's liability as a general partner. In addition, there is nothing in the limited partnership agreement expressly limiting the general partners' liability for LPMCA's obligations which might have given notice of such an intent to First Federal.

The record supports the court's finding that First Federal's waiver of personal guarantees did not relieve the general partners of their liability as general partners on the note, and thus, that finding is binding on appeal. *See People in Interest of C.A.K.,* 652 P.2d 603 (Colo.1982).

C.

■ Usher and LPMCA also claim that the evidence does not support the court's judgment of fraud against them. They argue that their failure to disclose the rental credit agreement was not fraudulent because that agreement was merely an internal partnership agreement which did not affect the rights of third parties. They further contend that the District was obligated to pay the rent set forth in the master lease by virtue of its representation in the subordination agreement that the master lease, as recorded, constituted the full rental agreement. We are not persuaded.

■ The elements necessary for proving fraud are: 1) a false representation or concealment of a material existing fact; 2) with knowledge that the representation was false or that the fact which was concealed in equity and good conscience should have been disclosed; 3) ignorance on the part of the one to whom representations are made or from whom such fact is concealed, of the falsity of the representation or of the existence of the fact concealed; and 4) justifiable reliance; 5) resulting in damages. *Morrison v. Goodspeed,* 100 Colo. 470, 68 P.2d 458 (1937).

In *Corder v. Laws,* 148 Colo. 310, 366 P.2d 369 (1961), the court held that the failure to disclose a secret rent concession constituted fraud. There, a vendor told prospective purchasers that property was fully leased and that the monthly rental income was $725. Additionally, he allowed the purchasers to examine the leases. However, he failed to reveal a private understanding with one tenant that it need not pay rent for six months, nor did he disclose that the tenant was unable to live up to its lease agreements and did not intend to occupy the space it had leased. In affirming the trial court's directed verdict, the court held that all the elements of fraud were established by these facts and that the vendor had a duty to inform the purchaser of the "exact nature of the then

existing relationship between himself and the [tenant]."

We see nothing in the facts of this case to distinguish it from *Corder.* The rental credit agreement was deliberately concealed from Camelback and First Federal to induce them to loan money to LPMCA. If First Federal had known that rent generated by the master lease was less than represented, the appraisal of the medical office building would have been reduced, and they would not have made the loan. As a result of the misrepresentation, the loan was secured by inadequate collateral.

Usher and LPMCA, citing *Gustafson v. Taber,* 125 Mt. 225, 234 P.2d 471 (Mont. 1951), contend that because the secret rent concession was an "internal" partnership agreement, they were under no duty to disclose it. However, that case concerned the liability of one who held himself out as a partner; it does not apply to the issue of whether failure to disclose a secret rent agreement constitutes fraud. Nor do we find merit in the unsupported argument that false representations by the District in its subordination agreement defeat First Federal's fraud claim against LPMCA.

Consequently, we hold that the evidence was sufficient to support the court's judgment of fraud.

### D.

■ We also conclude that the court applied a proper measure of damages. Usher and LPMCA argue that, under the "benefit of the bargain" rule, damages should be measured by the "difference between the actual value of the contract and what ... [its] value would have been had the misrepresentations been true." They further contend that, because no evidence was presented either as to the value of the contract as represented or in actuality, First Federal failed to prove any damages and that, consequently, the judgment for fraud should be reversed.

In cases involving a fraud committed as the result of a contract for the sale of real or personal property, the measure of damages is typically the difference between the actual value of the property at the time of

purchase and its value at the time of the damage award had the misrepresentation been true. *See, e.g., Colorado Performance Corp. v. Mariposa Associates,* 754 P.2d 401 (Colo.App.1987).

However, in cases concerning fraudulent inducement in procuring a loan, the proper measure of damages is the total amount of money loaned, plus interest. *Horne v. Walton,* 117 Ill. 130, 7 N.E. 100 (1886). *See also Application of Busse,* 124 Ill. App.3d 433, 79 Ill.Dec. 747, 464 N.E.2d 651 (1984) (if loan on real estate security is induced by fraudulent representations as to value of security, measure of damages is amount loaned with interest); *Gilbraltar Escrow Co. v. Thomas J. Grosso Investments, Inc.,* 4 Ariz.App. 490, 421 P.2d 923 (1966) (where plaintiff was fraudulently induced to lend monies to third parties, recovery should be measured by amount loaned).

Here, First Federal was fraudulently induced to loan money to LPMCA by the misrepresentations of its general partners as to the nature of the master lease. We hold that the court, in awarding the amount loaned, plus interest and less rental received, applied the proper measure of damages.

### E.

We find no merit in the argument of Usher and LPMCA that the court entered duplicative and excessive judgments. In its brief, First Federal acknowledges that the court did not intend its judgments to be cumulative, and it admits that it is entitled to only one recovery.

We note, however, that the judgments as entered could be construed as being duplicative. Such double recovery is not permitted, *Lexton–Ancira Real Estate Fund v. Heller,* 826 P.2d 819 (Colo.1992), and thus, remand is necessary for the trial court to vacate all existing judgments and to enter judgment only in favor of First Federal for the amount of the note, plus interest, less rental received by First Federal, plus a per diem interest amount, plus attorney's fees and costs.

IV. Equique Remedy

■ At the time LPMCA applied for the permanent loan, the medical office building was appraised at $2,825,000. However, when the equitable remedy was determined in late 1989, its value had dropped to $1,140,000. Usher and LPMCA contend that the court erred in using the lower appraisal as the measure of the District's enrichment, reasoning that the award should have been based on the value of the benefit at the time it was conferred upon the District.

The court stated that the equitable remedy was "designed to not only prevent unjust enrichment, but also to provide a means for the payment or satisfaction of an equitable share of the loan proceeds by the party principally benefited."

In *Normandy Estates Metropolitan Recreation District v. Normandy Estates, Ltd.*, 191 Colo. 292, 553 P.2d 386 (1976), the supreme court adopted the rule that: "[w]here property is furnished to a municipal corporation under an unenforceable contract, and the municipality has not paid for the property, then the seller or person supplying the property may, upon equitable terms, recover it *in specie.*" The *Normandy* court then directed that the recreation district be given the option of paying the balance on its note, with interest, or of returning the facilities to the seller after the seller returned all money paid on the purchase price. It made no inquiry as to the current market value of the property, and there was no indication that its value had declined.

Similarly, in none of the cases cited in the briefs was the value of the property at the time of the equitable award substantially less than at the time the benefit was conferred under an unenforceable contract. *See Chapman v. County of Douglas*, 107 U.S. 348, 2 S.Ct. 62, 27 L.Ed. 378 (1882); *Busch–Sulzer Bros. Diesel Engine Co. v. City of Walters*, 133 F.2d 65 (10th Cir. 1943); *Witchita Finance & Thrift Co. v. City of Lawton*, 131 F.Supp. 788 (W.D.Okla.1955), *aff'd per curiam*, 240 F.2d 600 (10th Cir.1957); *Hayward v. City of Corpus Christi*, 195 S.W.2d 995 (Tex.

Civ.App.1946). Consequently, in each instance, if the governmental entity elected to pay the balance owed the vendor and keep the property, there was no loss to the taxpayers because the property's value was greater than the amount owed.

Here, however, the court determined that a modification of the *Normandy Estates* rule was required because the value of the medical office building had declined substantially between 1982 and 1989. If the District were to keep the medical office building and pay the balance owed to First Federal, it would be required to pay an amount far in excess of the building's value. The court concluded that to base the award on the property's 1982 value would be to provide First Federal with an equitable solution that was not available at law because of statutory and constitutional prohibitions. *See Town of Glenrock v. Abadie*, 72 Wyo. 111, 262 P.2d 393 (1953) (equity cannot create a remedy in violation of law, nor can it disregard statutory and constitutional requirements and provisions).

On the other hand, it reasoned that using the 1989 value and additionally requiring First Federal to repay amounts reflecting improvements and rents received would result in a "miniscule" restitution obligation for the District. It further noted that the District had received such benefits from the payments as having referring doctors located near its facilities and use of the building for conferences, meetings, and treatment facilities without payment of rent. *See Bailey v. Miller County*, 24 Ga.App. 746, 102 S.E. 178 (1920) (claimant may have judgment for use of property delivered under an invalid contract).

We hold that the court properly modified the rule of *Normandy Estates*. Because the medical office building's appraised value had substantially declined, the court could not base its equitable award on the 1982 value without in effect enforcing the unconstitutional obligation incurred by the District. Nevertheless, it was within the court's discretion to reach an equitable result by not requiring First Federal to re-

turn rents received or to give credit for improvements to the property.

Because we affirm the court's judgments, we need not address the issues raised by First Federal in its supplemental brief.

The judgments are affirmed and the cause is remanded with directions to the trial court to vacate one of the judgments such that duplicate recovery is precluded.

CRISWELL and MARQUEZ, JJ., concur.