LA PLATA MEDICAL CENTER ASSO-
CIATES, LTD., a Colorado limited part-
nership, and Thomas J. Usher, Petition-
ers,

v.

UNITED BANK OF DURANGO; Charles
W. Black, Roderick K. Blacker, and Ed-
ward T. Searle, for themselves and all
other persons similarly situated; Reso-
lution Trust Corporation as Receiver
for First Federal Savings and Loan As-
sociation of Fargo, F.A., North Dakota;
and La Plata County Hospital District,
A Colorado Special District, Respon-
dents.

No. 92SC352.

Supreme Court of Colorado,
En Banc.

July 26, 1993.

Rehearing Denied Aug. 23, 1993.

Carl H. Seeliger, Jr., Hughes & Dorsey, Susan L. Linsley, Denver, for petitioners.

Burns, Wall, Smith & Mueller, P.C., George W. Mueller, Donald D. Farlow, Denver, Frank J. Anesi, Durango, for respondent Resolution Trust Corp. as Receiver for First Federal Sav. and Loan Ass'n of Fargo, F.A., North Dakota.

Justice VOLLACK delivered the Opinion of the Court.

Petitioners La Plata Medical Center Associates (LPMCA) and Thomas J. Usher (Usher) petition from the court of appeals decision in *Black v. First Federal Savings and Loan Association*, 830 P.2d 1103 (Colo.App.1992).[1] The court of appeals affirmed the district court's equitable ruling, but remanded the case for entry of one judgment in favor of First Federal Savings and Loan Association. We affirm.

## I.

In 1959, the La Plata County Hospital District (the hospital district) was formed, and a hospital was subsequently constructed. On October 14, 1982, the hospital district entered into a limited partnership agreement with Walter Meserole (Meserole) and Usher. The agreement stated that the name of the partnership was "La Plata Medical Center Associates, Ltd." (LPMCA). The purpose of the partnership was to construct a medical office building. The agreement identified Usher and Meserole as general partners, and an exhibit to the agreement identified the hospital district as a limited partner.

On October 14, 1982, the hospital district entered into a lease (the ground lease) with LPMCA, wherein the hospital district agreed to lease to LPMCA certain property adjacent to the hospital for a term of ninety-nine years. The annual rental fee was one dollar. On the same date, LPMCA obtained a construction loan in the amount of $2.3 million from Mount Carmel Credit Union and proceeded to construct the medical office building.[2]

On November 22, 1983, LPMCA entered into a lease (the master lease) with the hospital district, wherein LPMCA, as owner of the medical office building, agreed to lease approximately all of the space (27,692 square feet) of the medical office building to the hospital district. The term of the master lease was sixty months, to commence on December 1, 1983. For the first twelve months of the lease, the monthly rent was set at $34,166.67; for the thirteenth through twenty-fourth months of the lease, the monthly rent was set at $34,583.33; for the twenty-fifth through thirty-sixth months of the lease, the rent was set at $35,000.00; for the thirty-seventh through forty-eighth months of the

---

1. On September 29, 1986, Charles Black, among others, filed a complaint in intervention as taxpayers and qualified electors of the La Plata County Hospital District.

2. According to the hospital district's petition for declaratory and injunctive relief, the hospital district guaranteed this loan.

lease, the rent was set at $38,166.67; and for the forty-ninth through sixtieth months of the lease, the rent was set at $39,666.67. The master lease was recorded on December 13, 1983.

Additionally, on November 22, 1983, Usher and Meserole entered into a "rent credit" agreement with the hospital district. The parties expressly entered into the agreement "[i]n order to induce [hospital d]istrict to enter into a Master Lease of 27,692 square feet of space in the [medical office] ... building." The agreement stated that "on the 1st, 13th, 25th, 37th, and 49th months of the lease ... a rental credit in the amount of One Hundred Thousand Dollars ($100,000) will be given to the District. District will apply credit toward rental payment in aforementioned months plus subsequent months until credit is exhausted." This agreement was not recorded.

On December 13, 1983, LPMCA obtained a second loan in the amount of $350,000 from the United Bank of Durango (UBD) for tenant finish improvements. Usher and Meserole assigned the master lease to UBD as collateral security for the loan.

On February 15, 1984, Camelback Mortgage Corporation (Camelback) sent a letter to First Federal Savings and Loan Association (First Federal), enclosing information on a prospective loan in the amount of $2,943,000 to LPMCA. The letter stated that "we can get you 13⅛%; the loan will have 30 year amortization with a five year balloon." The letter additionally stated that

> The general partners of the limited partnership are Mr. Thomas Usher and Mr. Walter Meserole, and as you can see by their financial statements, both are substantial and what I like to see are their current assets, which are comprised mainly of cash on hand. Based on both their financial statements, they have li-

quidity in excess of $900,000. Mr. Usher and Mr. Meserole have been partners for many years in Western Management Associates.... They have built in the last couple of years several successful and attractive office buildings in the Phoenix market.... On the appraisal, I have been in contact with Mr. John Hatch, an MAI appraiser, who completed his report in September of 1983. His report is based on rental income.

The letter noted that the annual income yielded under the master lease would amount to $410,000 in the first year, $414,999 in the second year, $420,000 in the third year, $458,000 in the fourth year, and $476,000 in the fifth year. The letter included a copy of the hospital district's balance sheets as of June 1982 and June 1983.

On February 22, 1984, Camelback wrote a letter to First Federal wherein Camelback offered to sell First Federal the prospective loan to LPMCA. The letter noted that Usher and Meserole were personal guarantors of the loan, and that, as security, the buyer, First Federal, shall be assigned the seller's, Camelback's, interest in the ground lease.

On that same date, Camelback and First Federal executed a "whole loan sale and servicing agreement," wherein First Federal agreed to purchase the first mortgage loan granted by Camelback to LPMCA. The agreement provided that Camelback would service the loan. The agreement additionally stated that "Seller, upon Buyer's request, agrees to repurchase any mortgage covered by this agreement within 18 months after date of Buyer's remittance if any misstatement of material fact, intentional or otherwise, is disclosed."

Additionally, on February 22, 1984, Camelback sent a letter to LPMCA stating that it would grant LPMCA a first mortgage loan on the medical office building. The letter included the following provision:

TENANT LEASES:

The disbursement of loan funds is subject to the following tenant lease being satisfactory to Lender and in full force and effect, including said tenant having taken physical possession of their lease base and conforming to the following terms:

TENANT:
[The hospital district]

SF AREA:
Entire Building

YEARS:
5

MONTHLY RENT:

| Year 1 | $34,166.67 |
|---|---|
| Year 2 | 34,583.33 |
| Year 3 | 35,000.00 |
| Year 4 | 38,166.67 |
| Year 5 | 39,666.67. |

The letter did not mention the rent credit agreement. The names Usher and Meserole were scratched out as personal guarantors of the loan. Usher and Meserole accepted the agreement on February 28, 1984.

On March 9, 1984, the hospital district entered into a subordination agreement with UBD and Camelback. The subordination agreement noted that the hospital district granted a ground lease to LPMCA, and that the hospital district and UBD believed it to be in their best interest to "induce [Camelback] to make a loan to [LPMCA] secured by the lease by entering into the covenants and agreements contained herein." The hospital district agreed to subordinate its fee interest in the property upon which the medical office building was built, subject to the ground lease to Camelback's interest in a deed of trust to the ground lease.

On March 12, 1984, LPMCA obtained a first mortgage loan from Camelback in the amount of $2,943,000. LPMCA executed a deed of trust in the ninety-nine year ground lease in favor of Camelback to secure the $2.9 million loan. Camelback sold the loan to First Federal on that same date. Early in 1985, LPMCA defaulted on the promissory note. On September 5, 1985, First Federal wrote Camelback a letter wherein First Federal requested Camelback to execute the repurchase provision of the loan sale and servicing agreement. The letter stated that "[t]he misstatements of material fact which we have uncovered as of this date related to the ... value of

security for the loan," among other things. The letter specifically stated as follows:

B. *Value of the Security.* First Federal was induced to make the loan on the basis of appraisal provided to it by Camelback showing an appraised value of $3.5 million dollars as of September 9, 1983 which was amended to $4,000,000 on February 10, 1984 on the basis of the rent set forth in the Agreement to Lease dated October 13, 1983.... Subsequent inquiry by First Federal has disclosed that the Hospital, by admission of its Board of Directors, has consistent net operating losses which are subsidized by the taxpayers of La Plata County, and the appraisal value of the building was based upon a $15.00 per square foot lease value which is not supported by market information and did not take into account the Agreement between the Partnership and the Hospital District dated November 22, 1983 providing for an annual $100,000 credit against the rent set forth in the lease between the two entities....

On October 24, 1985, UBD filed a complaint against LPMCA, alleging that LPMCA owed approximately $64,967.74 on the original loan in the amount of $250,000. On that same date, the hospital district filed a petition against LPMCA, seeking a declaration that the partnership agreement was void, and that loans incurred by LPMCA amounted to constitutionally impermissible general obligation debt, in contravention of article XI, section 6, of the Colorado Constitution.

On December 10, 1985, First Federal filed a motion to intervene in the action filed by UBD against LPMCA. First Federal noted in its motion that the action by the hospital district against LPMCA was pending, and that First Federal was a named party in that action. The district court subsequently entered an order consolidating the two actions.

On December 16, 1985, First Federal filed an answer, counterclaim, and cross-claim, alleging that LPMCA made timely payments to Camelback until January of 1985. The answer additionally alleged that First Federal met with LPMCA in May and in September in order to discuss financing solutions to cure the default. First Federal sought the amount due under the promissory note in its counterclaim. In its cross-claims, First Federal sought specific performance of the loan repurchase agreement as against Camelback, among other things.

On October 7, 1986, First Federal filed an amended counterclaim and cross-claim. First Federal sought a judgment in the amount of $2,936,054.60 on the promissory note, against the hospital district. First Federal also sought damages against the hospital district for its breach of the subordination agreement. First Federal additionally sought damages for unjust enrichment against the hospital district. First Federal contended that it was entitled to specific performance of the repurchase provision of the loan sale agreement executed by Camelback; thus, First Federal sought a judgment in the amount of $2,936,054.60 against Camelback, among other things. First Federal also argued that LPMCA, Meserole, and Usher were liable to it for the amount of $2,936,054.60 under the promissory note. First Federal also claimed that LPMCA, Meserole, and Usher committed fraud against First Federal by failing to disclose the existence of the rent credit agreement when executing the loan.

First Federal additionally sought damages against LPMCA, Meserole, and Usher based on implied contract or unjust enrichment.

On October 30, 1987, the district court entered an order stating that the partnership agreement, the ground lease, and the master lease were all void insofar as they purported to be binding upon the hospital district. The district court found the hospital district violated article XI, section 6(1), of the Colorado Constitution by incurring debt by loan without prior voter approval. The district court concluded that "the Hospital District has no liability for debts incurred by the partnership." [3]

A trial commenced on November 17, 1987. Subsequently, on October 19, 1988, the district court entered an order titled "Findings, Conclusions, and Judgment." The district court determined that First Federal was entitled to relief against LPMCA, Meserole, and Usher based on its claim that they were liable on the promissory note in the amount of $2,936,054.60.[4] The district court additionally found that

> The fraudulent misrepresentation of . . . Meserole, Usher and LPMCA (less the District) directly and proximately caused damages to First Federal, for which they are jointly and severally liable, in the total amount of money loaned, plus interest, less rent received by First Federal pursuant to the Stipulation for Building Manager, plus costs and attorneys' fees.

With respect to First Federal's claims against the hospital district, the district court stated as follows:

> As to claims asserted by First Federal against the district, the Court's Order of October 30, 1987, in effect, denied First Federal the relief requested in its First and Second Claims for Relief of its counterclaim against the District. Its Fourth Claim for Relief for unjust enrichment has been reserved for the hearing to be set on the proposed equitable remedy

---

**3.** As a result of this order, the hospital district was relieved of any further liability in this action, thus precluding any need for the hospital district to appeal.

**4.** The district court stated that "First Federal is entitled to relief against Usher, Meserole, and LPMCA (less the District), jointly and severally as alleged in its First Claim for Relief of its First Amended Counterclaim and Cross–Claim."

which has resulted from the Court's October 30, 1987 Order.

The district court entered judgment in favor of First Federal and against LPMCA, Meserole, and Usher "based on the Camelback note in the sum of $2,936,054.60, plus interest in the amount of $898,324.44, less $175,000 as rental received by First Federal." The district court additionally entered judgment in favor of First Federal against LPMCA (less the hospital district), Meserole, and Usher for fraud, "in the sum of $2,936,054.60, plus interest in the amount of $898,324.44, less $175,000 as rental received by First Federal pursuant to the Stipulation for Building Manager, plus a per diem amount of interest of $1,070.43 from November 24, 1987, plus attorneys' fees and costs to be determined at a later hearing." The district court denied First Federal's claim for punitive damages.

The district court additionally entered judgment in favor of Camelback and against LPMCA (less the district), Meserole, and Usher "the same as entered for First Federal in paragraphs 1 and 2 of the Judgment." The district court concluded by stating that

9. All claims against the District ... are dismissed with prejudice; except that as to the District, an equitable remedy will be fashioned so as to avoid injustices and to resolve the issue of unjust enrichment.

. . . .

11. Adjustments on the monetary judgments awarded First Federal and Camelback will be made following the equitable remedies hearing and any unaccounted rental payments made to First Federal pending the resolution of this litigation.

More than one year later, on November 22, 1989, the district court entered an order titled "Findings, Conclusions, and Orders Re Equitable Remedy." The district court stated at the outset that the "equitable remedy is designed to not only prevent unjust enrichment, but also to provide a means for the payment or satisfaction of an equitable share of the loan proceeds by the party principally benefitted." The district court noted that the value of the medical office building, as of December 15, 1988, was $1,140,000. The district court concluded that "the market value as determined by the Court is approximately one-third of the remaining contract indebtedness." The district court noted that "[t]he District has had the use of a considerable part of the floor space of the [medical office building] and has received the indirect benefits from having doctors located in the [medical office building] on the hospital campus." The district court ruled as follows:

The District is afforded the choice of retaining the property by arranging for its payment on the determined value; or in the alternative, to surrender its title to the property and be fully discharged from any indebtedness arising from the invalid contract.

. . . .

Regardless of which option is selected by the District, the amount of the adjusted value ($1,140,000) is to be considered as a partial satisfaction of the judgment awarded First Federal against Camelback, ... Meserole, Usher, and LPMCA (less the District).

. . . .

The legal title to the Medical Office Building and the land upon which i: is situate is vested in the District.

In the event that the District elects to convey the [medical office building] in "specie" as its exercised option, then the conveyance should include the several elements contributed by the District. These elements are the land upon which the building is situate, the foundation, the party wall with the pre-existing hospital building, use of access roads, parking facilities, and utility hookups.

The district court entered a judgment awarding First Federal $1,140,000 against the hospital district, "to be satisfied by the District pursuant to their selected option." The district court additionally awarded LPMCA, Usher, Meserole, and Camelback an offset "in their favor of $1,140,000

against the judgment amounts heretofore granted First Federal."

The hospital district opted to purchase the medical office building but subsequently defaulted in making payments to First Federal. First Federal thus received title to the medical office building. In 1991, First Federal was placed into receivership.

Usher and LPMCA filed an appeal from the district court's rulings, challenging, among other things, the measure of damages applied by the district court, and the equitable remedy fashioned by the district court.[5] Usher and LPMCA argued that the district court applied an improper measure of damages. Specifically, "Usher and LPMCA argue[d] that, under the 'benefit of the bargain rule,' damages should be measured by the 'difference between the actual value of the contract and what ... [its] value would have been had the misrepresentations been true.' " *Black v. First Federal Savings and Loan*, 830 P.2d 1103, 1114 (Colo.App.1992). Usher and LPMCA further argued that, "because no evidence was presented either as to the value of the contract as represented or in actuality, First Federal failed to prove any damages and that, consequently, the judgment for fraud should be reversed." *Id.* The court of appeals held "that the court, in awarding the amount loaned, plus interest and less rental received, applied the proper measure of damages" for fraudulent inducement in procuring a loan. *Id.*

With respect to the equitable remedy, Usher and LPMCA contended that the district "court erred in using the lower appraisal as the measure of the District's enrichment, reasoning that the award should have been based on the value of the benefit at the time it was conferred upon the District." *Id.* at 1115. The court of appeals disagreed, and affirmed the district court ruling. *Id.* at 1115–16.

LPMCA and Usher filed petitions for a writ of certiorari, and we granted certiorari to determine:

Whether the court of appeals erred in holding that the measure of damages for fraud in the inducement in procuring a loan is the amount of the loan plus interest rather than the benefit of the bargain rule or rescission.

Whether the court of appeals erred in misapplying *Normandy Estates Metropolitan Recreation District v. Normandy Estates, Limited*, 191 Colo. 292, 553 P.2d 386 (1976), by adopting a modified method of determining the equitable remedy involving municipalities and districts by allowing the valuation of the benefit conferred on the district to be as of the trial date rather than as of the date the benefit is conferred or the amount remaining on the contract.

We affirm the opinion of the court of appeals with respect to the equitable remedy issue, and find that the issue regarding the measure of damages for fraud in the inducement of a loan contract has not been properly preserved for our review.

II.

◼ LPMCA and Usher contend that the court of appeals erred by affirming the district court's application of *Normandy Estates Metropolitan Recreation District v. Normandy Estates Limited*, 191 Colo. 292, 553 P.2d 386 (1976), to a determination of "the measure of the [Hospital] District's enrichment" when fashioning an equitable remedy in this case. *See Black v. First Federal Savings and Loan*, 830 P.2d 1103, 1115 (Colo.App.1992). We disagree.

We find that, as regarding First Federal and the hospital district, the district court's equitable ruling accords both the principles and the equitable relief condoned by this court in *Normandy Estates*. With respect to LPMCA and Usher, the remaining partners found liable on the promissory note, we find that the district court's ruling does not come within *Normandy Estates* because that case did not involve a contract entered into by *a limited partnership* wherein the municipal entity was only one

---

**5.** The court of appeals opinion indicates that Camelback and First Federal entered into a settlement agreement wherein Camelback assigned its rights against LPMCA, Meserole, and Usher to First Federal. Meserole did not appeal.

of several partners. We conclude that the district court's equitable ruling does not amount to an abuse of discretion.

We first discuss this court's holding in *Normandy Estates*, and then examine the district court's ruling with respect to First Federal and the hospital district. Lastly, we address the contentions of LPMCA and Usher.

## A.

## THE RIGHT TO RECOVER AGAINST MUNICIPAL CORPORATIONS

In *Normandy Estates Metropolitan Recreation District v. Normandy Estates Limited*, 191 Colo. 292, 553 P.2d 386 (1976), this court considered the issue of whether a private party who "contracts with a municipal entity may successfully invoke equitable relief when the municipality refuses either to perform the contract or to return to the plaintiff the consideration it has received." *Id.* at 295, 553 P.2d at 388. The electors of Normandy Estates Metropolitan Recreation District (the recreation district) had approved a bond issue for the purpose of purchasing or constructing recreational facilities. *Id.* at 293–94, 553 P.2d at 387. The recreation district subsequently entered into an agreement to purchase a swimming pool, among other things, from Normandy Estates Limited, a Colorado corporation (the private corporation). The swimming pool was installed on land owned by an officer of the private corporation; in conjunction with the agreement to purchase the pool, the recreation district entered into a lease for the land with the officer. *Id.* at 294, 553 P.2d at 387.

Two years after the initial agreements were entered into, the recreation district decided to purchase the land upon which the swimming pool was installed. The recreation district and the private corporation rescinded the first purchase agreement and lease, and entered into a second purchase

agreement wherein the recreation district agreed to acquire both the tract of land and the recreational facilities for a new purchase price. *Id.* The second agreement gave the recreation district credit for prior payments made by the recreation district, and the balance due "was represented by two promissory notes secured by a deed of trust." *Id.*

When one of the two promissory notes became due, the recreation district refused to pay the amount due, on the ground that the indebtedness was void as a result of the recreation district's failure to comply with section 89–12–25(1), C.R.S. (1953 & 1960 Supp.).[6] The private corporation subsequently initiated a foreclosure action wherein the private corporation argued that, if the indebtedness was deemed invalid, judgment should be entered in its favor on theories of either equitable estoppel or unjust enrichment. *Normandy Estates*, 191 Colo. at 294, 553 P.2d at 387. The district court declined to issue a temporary restraining order against the foreclosure action, and the private corporation purchased the property at a public auction.

The district court subsequently determined that the note and deed of trust were void as a result of the recreation district's failure to comply with the relevant statute. The district court set aside the foreclosure action, and found that the recreation district was required to pay the balance due on the second purchase agreement to the private corporation. The court of appeals affirmed, and held that, "where improvements had been added by the [recreation] district and the property had substantially increased in value, it would be inequitable to penalize the [recreation] district by permitting rescission [of the second purchase agreement]." *Id.* at 295, 553 P.2d at 388. The recreation district sought review in this court.

We noted that, prior to the present case, recovery was not afforded to parties con-

**6.** We noted in *Normandy Estates Metropolitan Recreation District v. Normandy Estates Limited*, 191 Colo. 292, 553 P.2d 386 (1976), that "[t]his statute in essence prohibits a district from incurring indebtedness to acquire recreational fa-

cilities in excess of 1–½% of the valuation for assessment of the district, and in no case in excess of $15,000, without first submitting the issue to the eligible electors of the district for their approval." *Id.* at 294, 553 P.2d at 388.

tracting with municipal corporations, premised in part on the rationale "that a party dealing with a municipal corporation is bound to see to it that all mandatory provisions of the law are complied with, and if he neglects such precaution he becomes a mere volunteer, and must suffer the consequences." *Id.* at 296, 553 P.2d at 389. We rejected that rule, however, because its application yielded unduly harsh results. We conversely concluded "that where property is furnished to a municipal corporation under an unenforceable contract, and the municipality has not paid for the property, then the seller or person supplying the property may, upon equitable terms, recover *in specie.*" *Id.*

With respect to the facts of that case, we concluded that "it would be grossly inequitable to permit the [recreation] district to continue to enjoy the benefits of the contract without *fully compensating*" the private corporation. *Id.* at 297, 553 P.2d at 389–90. We stated as follows:

> The trial court entered judgment for the unpaid balance of the purchase price, and the court of appeals affirmed. We believe, however, that under the particular facts of this case the proper remedy would have been to grant to the district the option either to pay the balance, with interest, or to return the property and facilities in question to [the private corporation].

*Id.*, 553 P.2d at 390.[7] Under either option, the recreation district was released from any further liability. We accordingly modified the court of appeals judgment and remanded the case.

Thus, under our holding in *Normandy Estates*, we approved of an equitable remedy which permitted the private corporation to recover either that which it contracted

for under the second purchase agreement, the balance of the purchase price owed plus interest, or to have title to the property returned to it; the recreation district, however, received the power to choose between options. *See id.* at 295, 553 P.2d at 388. In fashioning an equitable remedy in the present case, the district court awarded the hospital district and First Federal substantially the same relief.

## THE EQUITABLE RELIEF AFFORDED FIRST FEDERAL AND THE HOSPITAL DISTRICT IN THE PRESENT CASE

In its equitable order, the district court first noted that the limited partnership agreement was void insofar as it bound the hospital district.[8] The district court stated that the hospital district had received the benefits of the medical office building. The court stated as follows:

> The [m]edical [o]ffice [b]uilding is an integral part of the Community Hospital campus. It contains a special oncology unit and has, over the years, provided offices to doctors and others who perform services at the hospital. The hospital has also leased space within the building to itself and the Durango Cancer Center without payment of rent.

The district court additionally noted that the medical office building had "depreciated considerably since it was constructed due to changed economic and market conditions," and found that the market value of the medical office building was $1,140,000, its value as of December 15, 1988, the date upon which the appraiser testified at trial.

The district court subsequently noted that "[a]s of January 6, 1989, the amount of indebtedness owed First Federal as a

---

7. We limited our holding, however, by stating that
> the recovery authorized by this decision is a limited one. The party dealing with the municipal entity must have acted in good faith, and the contract must be one not positively condemned by law, as distinguished from one which is merely invalid because of want of power to contract or because statutory procedure was not followed in its making.

*Normandy Estates,* 191 Colo. at 297, 553 P.2d at 390 (citation omitted).

8. The district court did determine that the limited partnership agreement was binding upon LPMCA and Usher, in part on the ground that LPMCA and Usher failed to present a defense of illegality in a timely fashion.

result of the loan was $2,936,054.00 in principal and approximately $1,023,224.00 in interest, which includes credit for net rental proceeds paid to First Federal to that date." [9] The district court further noted that it had previously "awarded First Federal a judgment, jointly and severally, against LPMCA ... and Usher in the sum of $2,936,054.60, plus accrued interest." The district court ruled that,

> [c]onsidering all of the factors in this case, the only remedy which affords equity to the lender (First Federal) and the District (recipient of the benefit of the loan) is to establish the adjusted value at $1,140,000.00 without further adjustments for payments or contributions made. The [hospital d]istrict is to be afforded the option to retain the building by paying the full adjusted price; or convey title to the building to First Federal. By either selected option, the [hospital d]istrict discharges in full any indebtedness arising from the loan transaction on which this foreclosure and related remedies are based.
>
> ....
>
> Regardless of which option is selected by the hospital [d]istrict, the amount of the adjusted value ($1,140.00) is to be considered as a partial satisfaction of the judgment awarded First Federal against Camelback, ... Meserole, Usher, and LPMCA (less the District).

Thus, as in *Normandy Estates*, the hospital district, as a "municipal corporation," received the option of either retaining the medical office building and paying its market value to First Federal, or conveying the title to the medical office building to First Federal. Under either option, the hospital district was released from any remaining liability. First Federal, on the other hand, was fully compensated for its loss: it received either $1,140,000 from the hospital district and $1,796,054.60 (totaling the amount due under the promissory note) from LPMCA and Usher, or it received title to the property (valued at $1,140,000) from the hospital district and $1,796,054.60 from LPMCA and Usher.

Thus, the district court's equitable ruling regarding the municipal entity, the hospital district, and the private party, First Federal, accords with both the principles of *Normandy Estates* and the equitable relief approved therein. The present case differs from *Normandy Estates*, however, insofar as *Normandy Estates* did not contemplate what relief, if any, should be afforded to non-municipal defendants who remained liable on the contract from which the municipal defendant has been released from further liability. In the present case, there are additional defendants, LPMCA and Usher, who remain liable on the promissory note to First Federal. We now address their contentions.

### C.

### LIABILITY OF THE REMAINING PARTNERS

■ Relying on *Normandy Estates*, LPMCA and Usher now contend that the value of the medical office building should be set at $2,825,000.00, the value set on the approximate date upon which the hospital district took possession of the building. LPMCA and Usher do not contend that the district court ruling amounts to an abuse of discretion.[10] Rather, LPMCA and Usher

---

9. The district court noted that the hospital district urged it to apply *Normandy Estates,* and to permit it to "surrender title to the [m]edical [o]ffice [b]uilding to First Federal at its current market value of $1,140,000.00, subject to a refund of monies paid by the [hospital d]istrict to First Federal." The district court noted that "[t]his refund amounts to approximately $368,-000.00, subject to adjustments for space used and not paid for by the [hospital d]istrict and the Cancer Center. This formula would allow the [hospital d]istrict to be relieved from a debt obligation (held to be unenforceable) in an amount now exceeding $4 million for a price of $772,000.00."

10. LPMCA and Usher contend that "[t]he party contracting with a municipality should not have to bear the risk of the value of the improvement declining when it is not in a position to control the future of the improvement." Thus they contend that it is inequitable to charge *them,* under *Normandy Estates,* with the downward valuation of the building. First Federal, however, and not LPMCA and Usher, was the party contracting with the hospital district. Additionally,

contend that the hospital district should have the option to either retain the property and pay $2,825,000 (and not $1,140,000), plus interest, or to return the property. Their contentions misconstrue the application of *Normandy Estates* to the facts of this case and are unpersuasive.

As previously noted, *Normandy Estates* did not contemplate a fact pattern wherein a private corporation deals, not with a municipal entity acting alone, but with a limited partnership wherein a municipal entity is one of several partners. In *Normandy Estates*, after the recreation district was released from liability under the second purchase agreement, no additional defendants remained liable. In the present case, however, the district court found that LPMCA and Usher remained liable on the promissory note after the hospital district was released from liability. Accordingly, *Normandy Estates* does not dictate that any equitable relief should be afforded to the partners, LPMCA and Usher, who remain liable on the promissory note.

■■■ Generally, the power to fashion equitable remedies lies within the discretion of the trial court. *Restatement (Second) of Contracts* § 357 cmt. c (1981) ("The granting of equitable relief has traditionally been regarded as within judicial discretion."); *see* Dan B. Dobbs, *Law of Remedies* § 2.1–2.4 (2d ed. 1993). Such rulings will not be disturbed on appeal absent a showing of abuse of discretion. *Colorado Nat'l Bank of Denver v. Friedman*, 846 P.2d 159, 166–67 (Colo.1993) (quoting *Nagy v. District Court*, 762 P.2d 158, 161 (Colo.1988) ("[A] trial court's actions amount to an abuse of discretion when the actions are 'manifestly arbitrary, unreasonable, or unfair.' ")). The district court's equitable ruling in the present case does not amount to an abuse of discretion.

As previously noted, the district court gave the hospital district the option of either retaining the building by paying the market value of $1,140,000, or conveying title to the building to First Federal. The district court stated that using the value of

$2,825,000 "would substantially provide the lender under an equity solution with the relief heretofore determined nonavailable due to statutory and constitutional prohibitions." The district court additionally noted that using the value of $1,140,000 "provides a fair and workable means of avoiding unjust enrichment to the [hospital d]istrict, unreasonable forfeiture by the lenders [First Federal], and compliance with the constitutional and statutory constraints upon governmental entities."

In its equitable order, the district court gave LPMCA and Usher a partial satisfaction of that judgment, greatly reducing the amount owed by them. Were we to adopt LPMCA and Usher's contentions and find that the district court's valuation of the medical office building should be set at $2,825,000, LPMCA and Usher would receive a partial satisfaction of the judgment entered against them in that amount. Their liability would be reduced from *$1,796,054.60* to *$111,054.60*. Such a result would not produce equitable results in the present case, since the district court correctly determined that this result would impermissibly accomplish in equity that which could not be accomplished at law, and since First Federal would not then be fully compensated, as is required by *Normandy Estates*.

We are not persuaded that the district court's equitable ruling amounts to an abuse of discretion in light of the facts of this case. In selecting a value that did not attempt to accomplish through equity that which could not be achieved at law, the district court acted reasonably. We thus affirm the court of appeals ruling with respect to the equitable remedy.

### III.

■■■ LPMCA and Usher contend that the court of appeals, in affirming the trial court, applied a measure of damages for fraud in the inducement of a loan contract that is not supported by Colorado law. We find, however, that the issue of whether the court of appeals applied the appropriate

under the district court's equitable order, First Federal was fully compensated.

measure of damages premised upon such a claim is not properly presented for our review.

In its order dated October 19, 1988, the district court entered judgment in favor of First Federal and against LPMCA, Meserole, and Usher "based on the Camelback note in the sum of $2,936,054.60, plus interest in the amount of $898,324.44, less $175,-000 as rental received by First Federal." The district court additionally entered judgment in favor of First Federal against LPMCA (less the district), Meserole, and Usher for fraud, "in the sum of $2,936,-054.60, plus interest in the amount of $898,-324.44, less $175,000 as rental received by First Federal," pursuant to the Stipulation for Building Manager, "plus a per diem amount of interest of $1,070.43 from November 24, 1987, plus attorneys' fees and costs to be determined at a later hearing." [11] LPMCA and Usher argued to the court of appeals that this entry of judgments was duplicitous. *Black v. First Federal Savings and Loan*, 830 P.2d 1103, 1114 (Colo.App.1992).

The court of appeals stated as follows:
> We note ... that the judgment as entered could be construed as being duplicative. Such double recovery is not permitted, *Lexton–Ancira Real Estate Fund v. Heller*, 826 P.2d 819 (Colo.1992), and thus, remand is necessary for the trial court to *vacate all existing judgments* and to enter judgment only in favor of First Federal for the amount of the note, plus interest, less rental received by First Federal, plus a per diem interest amount, plus attorney's fees and costs.

*Id.* (emphasis added). The court of appeals subsequently stated that "[t]he judgments are affirmed and the cause is remanded with directions to the trial court to vacate one of the judgments such that duplicative recovery is precluded." *Id.* at 1116. LPMCA and Usher did not challenge the propriety of this remand order in their request for relief from this court.

In its remand order, the court of appeals did not specify whether the one judgment should be entered on First Federal's breach of contract claim or on First Federal's fraud claim. Thus, in its present posture, there is no entry of judgment premised upon fraud in the inducement of loan. Because the propriety of the remand order is not before us, we cannot consider whether the court of appeals applied the appropriate measure of damages for fraud in the inducement of a loan.

### IV.

We affirm the court of appeals opinion with respect to the district court's application of *Normandy Estates* to the equitable remedy, and conclude that the issue regarding the propriety of the measure of damages for fraud in the inducement of a loan is not properly before us.

SCOTT, J., does not participate.

---

11. The district court did state, in its equitable remedy order entered on November 22, 1989, that it had "awarded First Federal a judgment, jointly and severally, against LPMCA, Meserole, and Usher in the sum of $2,936,054.00 plus accrued interest of $898,324.44, less 175,000.00 for rentals paid."