T.C. Memo. 2011-257

UNITED STATES TAX COURT

TREVE W. AND STEPHANIE L. KINSEY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15862-09.                    Filed November 1, 2011.

<u>Donald W. Wallis</u> and <u>Casey W. Arnold</u>, for petitioners.

<u>Joel D. McMahan</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  Respondent determined a deficiency of $60,333
in petitioners' 2004 Federal income tax and also asserts an
increased deficiency.  On an amended 2004 joint income tax return
petitioners claimed over $347,000 as a loss on their Schedule E,
Supplemental Income and Loss, asserting that they held 100
percent of the ownership in Twentieth Century Mortgage, Inc.

(TCM). The disallowance of this loss is the basis of the original deficiency. Respondent disallowed the loss because he determined petitioners were not owners of TCM in 2004. Respondent also asserts that petitioners are judicially estopped from claiming ownership of TCM for 2004 because Mr. Kinsey took a contrary position in prior litigation. After this case was docketed, respondent asserted an increased deficiency on the basis of a claim that Mr. Kinsey had received income of $44,152.44 upon TCM's paying legal fees on his behalf in 2004. For the reasons stated herein, we find that petitioners were not shareholders of TCM in 2004, and respondent's increased deficiency is not sustained.

FINDINGS OF FACT

Petitioners resided in Florida when the petition was filed. Before December 2004 petitioners resided in Colorado. In 1997 Mr. Kinsey founded TCM in Colorado to perform services as a mortgage broker. TCM was a subchapter S corporation.

In February 2002 Mr. Kinsey consulted with Ronald Brasch to sell TCM. Mr. Brasch was an experienced business broker working for First Business Brokers in Colorado Springs, Colorado. In early April 2002 Mr. Brasch began representing Mr. Kinsey to market and sell TCM. Mr. Brasch created an advertising package and began extensively marketing TCM on June 12, 2002. The value of TCM declined between 2001 and 2003 because the profitability

of TCM had declined during that period. In the beginning of 2003 Mr. Brasch updated TCM's financials to reflect its poor performance in 2002. Between January and June 2003 Mr. Brasch received no formal offers for TCM.

Gerald Small, a principal of Amerifunding/Amerimax Realty Group, Inc. (Amerifunding), a mortgage brokerage business, emailed Mr. Brasch inquiring about the purchase of TCM in January 2003 but did not respond when contacted by Mr. Brasch's office. Mr. Small emailed Mr. Brasch again in May 2003 inquiring about the purchase of TCM. On May 12, 2003, Mr. Small responded to Mr. Brasch with appropriate confidentiality paperwork. On August 19 or 20, 2003, Mr. Brasch received Mr. Small's letter of intent to purchase TCM for $2.1 million. The terms of this initial offer contemplated a payment of $500,000 at closing with the remainder to be paid in three quarterly payments. One day after his initial offer, Mr. Small increased his offer by approximately $1.3 million.

On September 3, 2003, Mr. Kinsey proposed a $100,000 discount to the buyer for an all-cash transaction. On September 30, 2003, Mr. Brasch received a draft purchase agreement listing Chad Heinrich, an employee of Amerifunding, as the buyer instead of Mr. Small. After learning that Mr. Heinrich would be named as the purchaser, Mr. Brasch informed Mr. Kinsey that a credit

report should be completed on Mr. Heinrich. Mr. Kinsey claims to have accepted a credit report given to him by Mr. Heinrich.

First Collateral Services, Inc. (First Collateral), was a lending institution that provided credit lines to, among others, TCM. Before the TCM sale closed, Mr. Kinsey knew that First Collateral would not do business with Mr. Small. Mr. Kinsey did not tell First Collateral of Mr. Small's relationship to Mr. Heinrich.

Mr. Kinsey was represented by an attorney, Robert Horen, throughout the negotiations and sale of TCM. Mr. Kinsey, through his representatives, structured the sale of TCM as $2 million in cash for the sale of the stock, with the remainder in cash for Mr. Kinsey's retained earnings in TCM. The closing for the sale of TCM occurred on December 2, 2003, at Mr. Horen's office. To complete Mr. Kinsey's sale of TCM to Mr. Heinrich, a total of $3,370,804.76 was wire transferred to First Business Brokers on December 3, 2003.

At the closing, Mr. Heinrich received the stock certificate of TCM. Mr. Brasch received $190,000 as a fee for brokering the sale of TCM. Petitioners received $3,180,804.76 via wire transfer dated December 3, 2003. In addition to cash, Mr. Kinsey obtained an employment agreement to work for TCM as its president for a $240,000 annual salary, plus bonuses and expenses. Mr. Kinsey's employment agreement with TCM required that he work at

TCM's offices in Aurora, Colorado.  During 2004 Mr. Kinsey worked for TCM pursuant to the employment agreement as a mortgage broker and president.

In December 2003 false applications on behalf of Amerifunding and TCM for a warehouse line of credit with Flagstar Bank, FSB (Flagstar), a Michigan-based bank, were made in excess of $15 million.  Flagstar specializes in mortgage lending and, as part of its mortgage-lending business, originates loans directly on its own, provides various types of financing for mortgage brokers, assists brokers on sales and underwriting, and buys and sells mortgage-backed securities as a correspondent permanent lender.  A similar line of credit with Impac Warehouse Lending Group (IMPAC) caused millions of dollars to be advanced to Amerifunding through TCM in December 2003.

In April 2003 Flagstar entered into an agreement to advance Amerifunding an amount not to exceed $20 million.  These funds were to be used to obtain residential mortgages that TCM would originate and broker.

By March 2004 Flagstar had discovered that Amerifunding was engaged in theft and a scheme to defraud Flagstar.  Amerifunding had used fraudulent buyers who used false identities and created fraudulent mortgages in these individuals' names.  As a result of the scheme, Flagstar advanced approximately $155 million to Amerifunding and TCM on the basis of fraudulent loan applications

and suffered losses of approximately $23.4 million. IMPAC advanced approximately $99.7 million to Amerifunding on the basis of fraudulent loan applications and suffered losses of approximately $12.9 million. Mr. Heinrich, Mr. Small, and Mr. Small's wife were indicted.

As a result, in 2004 and 2005 various civil lawsuits were filed, including a March 2004 suit by Flagstar against Amerifunding, TCM, Mr. Heinrich, Mr. Small, Mrs. Small, and Mr. Kinsey. All of the defendants with exception to Mrs. Small, Mr. Kinsey, and TCM have defaulted. In the Flagstar lawsuit, Mr. Kinsey testified that he was not liable to Flagstar for fraud and negligence because he was not the owner of TCM and he reported to Mr. Heinrich acting merely as an employee and under Mr. Heinrich's direction.

On February 18, 2005, Mr. Heinrich pleaded guilty to two counts of felony fraud against Flagstar in the U.S. District Court for the District of Colorado, for wire fraud. As part of his plea, Mr. Heinrich admitted to his participation in a conspiracy which used TCM to commit fraud against Flagstar and IMPAC. Mr. Heinrich was imprisoned for 28 months and ordered to pay restitution of $22.4 million to Flagstar and approximately $12.6 million to IMPAC.

On May 25, 2005, Flagstar and IMPAC filed a civil action to levy upon TCM stock held by Mr. Heinrich. As part of the

bankruptcy case, TCM filed actions to prevent the transfer of the stock to Flagstar.  Flagstar also filed an action against Mr. Kinsey and TCM.  To settle these claims, Mr. Kinsey agreed to pay Flagstar $1.5 million.  For the payment, Mr. Kinsey and TCM would receive a release of all claims and Flagstar's agreement to facilitate the return of TCM stock to Mr. Kinsey.

By letter dated June 28, 2004, TCM confirmed with Mr. Heinrich that Mr. Kinsey was authorized to continue operating TCM.  In 2004 TCM paid Mr. Kinsey's personal attorney's fees in an amount not less than $44,152.44.

On June 7, 2005, Mr. Kinsey, as president of TCM, filed for chapter 11 bankruptcy in the U.S. Bankruptcy Court for the District of Colorado (the bankruptcy court).  In TCM's bankruptcy statement of financial affairs, Mr. Kinsey listed Mr. Heinrich as the 100-percent owner of TCM.

On February 14, 2006, the bankruptcy court granted a motion to approve the settlement agreement.  In his testimony before the bankruptcy court, in the settlement agreement, and in the motion to approve settlement, Mr. Kinsey took the position that he had sold 1,000 shares of stock in TCM to Mr. Heinrich on December 3, 2003, and that he was not an owner of TCM thereafter.

The bankruptcy court approved the settlement, and Mr. Kinsey discontinued TCM as a business in 2006.  Petitioners did not report as income for 2004 TCM's payments to Mr. Kinsey's attorney

in 2004. Petitioners did not report any distributive share of income or loss from TCM on their initial 2004 return, but they claimed the loss from TCM on an amended return, as previously described.

On March 27, 2009, respondent issued the notice of deficiency for 2004 underlying this proceeding and also described above. On June 30, 2009, petitioners timely filed their petition with this Court.

OPINION

We decide this case on the factual record before us, and the burden of proof does not affect the outcome.

## I. The Original Deficiency Determination

A sale is generally defined as a transfer of property for "money or its equivalent". Commissioner v. Brown, 380 U.S. 563, 571 (1965). The key determination is "whether the benefits and burdens of ownership have passed" from the seller to the buyer. Grodt & McKay Realty, Inc. v Commissioner, 77 T.C. 1221, 1237 (1981). This is a factual determination based on the intent of the parties "as evidenced by the written agreements, read in the light of the attending facts and circumstances". Haggard v. Commissioner, 24 T.C. 1124, 1129 (1955), affd. 241 F.2d 288 (9th Cir. 1956). Relevant factors used by this Court are: (1) Whether legal title passed; (2) how the parties treated the transaction; (3) whether equity was acquired in the property; (4)

whether the contract created a present obligation on the seller to deliver and an obligation on the buyer to make payments; (5) whether the right of possessions vested with the purchaser; (6) which party pays the taxes associated with the property; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property. Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237-1238.

Although their petition makes reference to Mr. Kinsey's "sale" of TCM in December 2003, petitioners' amended petition refers to the sale as an "event" and claims that the substance of the "event" did not shift the benefits and burdens of ownership in TCM. Petitioners argue that because Mr. Kinsey disagreed with the buyer's operation of TCM, the "event" somehow did not transfer ownership to the buyer. Instead, petitioners argue the substance of the transaction was a lease, rather than a sale. Petitioners concede that if Mr. Kinsey is not the sole shareholder of TCM throughout 2004, the notice of deficiency is correct. However, for the reasons detailed below, the "event" in 2003 was indeed Mr. Kinsey's sale of TCM stock, complete with a purchase and sale agreement and a transaction closing that occurred at the offices of Mr. Kinsey's attorney. Mr. Kinsey's sale of TCM stock transferred the benefits and burdens of ownership from Mr. Kinsey to Mr. Heinrich after the closing

occurred on December 2, 2003. In fact, Mr. Kinsey and Mr. Heinrich negotiated and signed a detailed "stock purchase and sale agreement" with the assistance of counsel. The terms in this document clearly indicate that the intent of both parties was to transfer ownership of 1,000 shares of stock in TCM from Mr. Kinsey to Mr. Heinrich.

Moreover, in exchange for his stock of TCM, Mr. Kinsey received $3,370,804.76 in cash via a wire transfer through his business broker, and Mr. Heinrich received legal title to TCM. As a result, the "event" petitioners refer to was a transaction through which Mr. Kinsey received the benefit of his bargain (i.e., $3.3 million) in exchange for the stock of TCM. Mr. Kinsey remained with TCM under an employment agreement, but he relinquished control of the company to Mr. Heinrich. Consequently, the benefits and burdens of TCM ownership shifted in connection with the 2003 TCM stock purchase and sale agreement.

The Court of Appeals for the Eleventh Circuit has held that when a taxpayer attempts to disregard the form of a transaction, the taxpayer must show that the agreement was a result of fraud, duress, or undue influence. Bradley v. United States, 730 F.2d 718, 720 (11th Cir. 1984); Spector v. Commissioner, 641 F.2d 376, 382 (5th Cir. 1981) (relying on Commissioner v. Danielson, 378 F.2d 771, 775 (3d Cir. 1967)), revg. and remanding 71 T.C. 1017

(1979).  However, in this case, Mr. Kinsey was not defrauded but instead received the full contract price for the sale of his stock.  Petitioners' amended petition makes no allegation that Mr. Kinsey was defrauded.  Instead, Mr. Kinsey admits that he received approximately $3.3 million via a wire transfer in exchange for selling his TCM stock.

Petitioners argue that after the stock sale, Mr. Heinrich and Mr. Small used TCM to defraud third-party banks that lent funds to TCM.  They assert that "kind of like with a stolen get-away car used in a bank robbery, * * * [TCM's buyer] just trashed it and abandoned it on the side of the road."  However, the sale is not avoided because of the manner in which TCM was later operated.  Mr. Kinsey was paid the agreed price; the fraud was not perpetrated on him as part of the sale.

The Kinseys cite Black v. First Fed. Sav. & Loan Association of Fargo, N.D., 830 P.2d 1103 (Colo. App. 1992), and claim that each of the fraud elements described in Black are present in the instant case.  The court in Black upheld the lower court's conclusion that "First Federal was fraudulently induced to loan money".  Id. at 1114.  In their argument, petitioners explicitly concede that "In this case, the contract and the transaction based on it were not induced by fraud."

Next, citing Colo. Plasterers' Pension Fund v. Plasterers' Unlimited, Inc., 655 F. Supp. 1184 (1987), petitioners argue that

the doctrine of fraud in the execution should void Mr. Kinsey's sale of TCM ab initio. However, the court in <u>Colo. Plasterers' Pension Fund</u> explained that in Colorado, "fraud in the execution 'is fraud exercised in reference to the acts of signing and delivering an instrument, sometimes by a deceptive substitution of documents causing someone to sign an instrument without knowing the consequences of his act.'" <u>Id.</u> at 1186-1187 (quoting <u>Meyers v. Johanningmeier</u>, 11 <u>Brief Times Reporter</u> 122 (Feb. 6, 1987)).

Quoting the Restatement (Second) of Contracts, sec. 163 Illustration 2 (1981), the court explained by way of example:

> A and B reach an understanding that they will execute a written contract containing terms on which they have agreed. It is properly prepared and is read by B, but A substitutes a writing containing essential terms that are different from those agreed upon and thereby induces B to sign it in the belief that it is the one he has read. B's apparent manifestation of assent is not effective.

<u>Colo. Plasterers' Pension Fund v. Plasterers' Unlimited, Inc.</u>, <u>supra</u> at 1187.

There has been no allegation and no evidence to suggest that the TCM sale contract negotiated by Mr. Kinsey's attorney and executed in his attorney's office was surreptitiously replaced by some other document. Instead, the record is clear that (1) Mr. Kinsey was well represented in his transaction by a business broker and legal counsel, (2) he closed the transaction at the office of his own counsel, and (3) he received in excess of $3.3

million via wire transfer at the conclusion of the transaction. We can see no fraud in the execution.[1]

Petitioners' alternative arguments that the transaction must be voided on the basis of fraud and illegality fail for the reasons explained regarding the fraud in the execution argument.

II.  The Increased Deficiency

Section 61[2] provides that gross income includes all income from whatever source derived, unless the taxpayer can establish the application of a specific legislative authorization to exclude income from taxation.  Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 429-430 (1955).  In this respect, a third party's discharge of a taxpayer's obligation is income to the taxpayer.  Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929).  During 2004 TCM paid attorney's fees of $44,152.  The fees related to the representation of Mr. Kinsey and TCM in TCM's bankruptcy proceeding.  As a result, respondent asserts that Mr. Kinsey should have included in income the amounts paid as attorney's fees.  "That the funds were paid directly to petitioner's attorney and not to petitioner does not alter this result."  Sanford v. Commissioner, T.C. Memo. 2008-158.  There is

---

[1]Respondent also asserts judicial estoppel regarding the sale of TCM stock in 2003 as a result of the representations in the bankruptcy filing.  Because we reject petitioners' claims that the sale should be disregarded, it is unnecessary for us to reach this argument.

[2]All section references are to the Internal Revenue Code in effect for 2004.

no dispute the amount was paid, and petitioners did not report this amount on their 2004 tax return or amended return. At the time of the legal fee payment, the legitimate operations of TCM were still directed by Mr. Kinsey. This issue turns on whether in directing payment of these legal fees, Mr. Kinsey was paying a legitimate expense of TCM, rather than his own personal expense. We find on the facts before us that the payment in 2004 was a reasonable expenditure of TCM funds in attempting to extricate TCM and its president, Mr. Kinsey, from the results of the fraudulent actions after the sale in 2003. We do not find that the payment was primarily for Mr. Kinsey's personal benefit. Consequently, petitioners' income should not be increased by $44,152.44 for the 2004 taxable year.

To reflect the foregoing,

Decision will be entered for respondent as to the original deficiency determination and for petitioners as to the asserted increased deficiency.